505 So.2d 798 (1987)
Sherry TEMPLE, Plaintiff-Appellant,
v.
Russell SHANNON, Scott Truck and Tractor Company of Monroe, Inc. and Commercial Union Insurance Company, Defendants-Appellees.
No. 18491-CA.
Court of Appeal of Louisiana, Second Circuit.
April 1, 1987.
Rehearing Denied April 30, 1987.
*800 Bruscato, Loomis & Street by C. Daniel Street, Monroe, for plaintiff-appellant.
Davenport, Files & Kelly by Mike C. Sanders, Monroe, for defendants-appellees.
Before MARVIN, FRED W. JONES, Jr., and SEXTON, JJ.
MARVIN, Judge.
In this action arising out of a collision between a pickup truck and a van, plaintiff, a 45-year-old housewife and business owner, appeals to seek an increase in damages awarded her and to reverse the trial court's allocating 25 percent of the fault to her. Defendants, the truck driver, his employer and its liability insurer, answer the appeal and seek to increase the percentage of fault allocated to plaintiff.
The issues, besides quantum, concern whether Mrs. Temple drove her van on the highway or its shoulder from an adjacent parking lot in the face of the pickup truck proceeding southerly on the highway, and if so, to what extent did this conduct contribute to the cause of the accident.
For reasons we assign, we amend and affirm.

*801 FACTS
The accident occurred on a rainy morning in August 1985 on or near La. Hwy. 15, a two-lane major highway running northerly and southerly through the town of Gilbert, on which Shannon, the truck driver, was proceeding southerly. Facing the highway on the west side is a cafe known as RV's Food & Fun with parking for its customers in front of the cafe.
This record does not contain a scale plat of the accident scene. Drawings in the record that were made by several witnesses depict the scene roughly as follows:

Mrs. Temple testified that she entered the parking lot on the north, drove southerly in front of the cafe to allow her mother and her son to depart from the van to enter the cafe. She then made a U-turn around the row of parked cars nearest the highway and proceeded northerly between those vehicles and the west edge of the paved highway, seeking a place to park her van. She said she saw the pickup swerve on the highway, out of control, and skid into the parking lot where it struck the right rear of her van, propelling it into a parked truck.
The truck driver, Shannon, and his passenger, Tedeton, testified that the van entered the highway from the parking lot, causing Shannon to "slam" on his brakes and skid into the van as it was turning back into the parking lot. Shannon and Tedeton insisted that the impact occurred in their lane of travel, the southbound lane of Hwy. 15.
After impact, the van was in the parking lot about five feet west of the painted white line separating the west shoulder of the highway from the southbound lane of the highway. Testimony about the exact *802 location of the pickup after impact was not consistent, but the witnesses seemed to agree that some part of the left rear corner of the truck was in the southbound lane and the right front corner of the truck extended across the white line that was painted along the west side of the pavement to separate the pavement from the shoulder. Witnesses estimated the width of the shoulder as narrow as two feet and as wide as eight feet.
A deputy sheriff who was at the cafe estimated the distance between the white line and the parked cars as 10 feet and said that the van was off the highway after impact. The investigating officer, a Gilbert policeman, estimated the distance between the white line and the parked cars as "six or seven feet." He said the van was "four or five feet" away from the white line when he arrived to investigate. The width and length of the van were not given.
One cafe customer, Arnold, who was in the parking lot, estimated that the distance between the white line and the parked vehicles was 16 to 20 feet. Another customer inside the cafe, Holcomb, estimated the distance at 15 feet. Mrs. Temple estimated the distance at 16-18 feet. Shannon and Tedeton estimated the distance at 8-10 feet. Mrs. Temple insists that she did not drive the van onto the southbound lane of the highway. Shannon and Tedeton insist that she did.
The trial court, in reasons for judgment, did not resolve the specific conflicts in the testimony of the witnesses, but said:
Gentlemen, I think ... there [is] very little you can agree on. There's only three people who actually know what happened and that was Mr. Shannon, [his passenger] ... and Mrs. Temple. I certainly don't know what happened. At this point, I'm not going to try to figure it out any closer than what you've just presented. It could have happened either way you just said, I certainly think Mrs. Temple has some of the responsibility. Obviously, Mr. Shannon has some of the responsibility. Regardless of that, you've got four witnesses saying she never left the parking lot, as opposed to Mr. Shannon and [his passenger] saying that she was up in the middle of the road. Quite frankly, of course, I've got some question about that, ah, that's neither here nor there. You've got four witnesses saying that she never left the parking lot.
Now, as far as damages, and I might point out here that your own witness, Mr. Mert Girod, testified that if he were going to arrive at a damage, he would do it exactly the way this appraiser did it. This appraiser listed all three values that he could get, had the deductions involved and came up with a figure of sixteen hundred seventy dollars and thirty-three cents. It then goes to say that his opinion of a reasonable value is fifteen hundred dollars by benefit of inspection. I'm going to give you the extra hundred and seventy dollars above his opinion, as far as the van is concerned, I'm going to award you sixteen hundred seventy dollars and thirty-three cents.
Now, as far as the medical, I told counsel in chambers and I'm going to state it for the record, `cause I'm sure this is probably going to the second circuit, I don't think much of chiropractors. As far as I'm concerned, this bill was grossly inflated. Matter of fact, it is so grossly inflated, in this Court's opinion it's ridiculous.
Further, I don't understand how anyone could be in pain for over three months, as has been claimed, and not go see a medical doctor. As a matter of fact, I'd have been looking for a specialist, and if my arm were drawing, I would have hooked `em up immediately and found somebody that could tell me what was wrong. I'm only going to award eleven hundred and eighty three dollars on the medical. If the second circuit wants you to get more than that, they'll have to order it.
Now, as far as the pain and suffering, I'm in a real quandry. Dr. Webb, for whatever his qualification, seems to verify that she had some pain and suffering. Quite frankly, I doubt it was as much as *803 has been claimed and I certainly don't think it was anywhere near seventy-five hundred dollars worth. Ah, going back to what I said earlier, if I were hurt that badly, I would want to see a medical doctor and find out what was wrong. Ah, I think [defendants] made a good point, ah, when she was examined by a doctor, but there has been no testimony by a doctor introduced whatsoever, nor were the X-rays even brought up here. There is no concrete evidence whatsoever to back up any pain and suffering. As far as the pain and suffering, I'm going to award twelve hundred dollars. As far as Dr. Webb and his fee, I'm going to award you sixty dollars on that. Anything further?
[PLAINTIFF ATTORNEY]: That's it youryour honor, we'll submit a judgment at a later date.
[DEFENDANT ATTORNEY]: Your Honor, clarification I don't mean to appear overly bold, but I didn't understand perhaps when you were giving your opinion about the damages, did you assign any, any percentage of fault to the parties or was one hundred per cent on-on
THE COURT: No, no, I'm assigning Mrs.you know the theory of comparative negligence we operate under now I think is a bastard child, I'm not really sure how they ever derived. [sic] I certainly think Mrs. Temple was at fault. To what degree, I'm [not] prepared to say here. Ah, if you want an absolute determination of fault, I'll give you twenty-five percent and seventy-five percent. Ah, but I don't know how youyou know I can't really arrive at a percentage.
* * * * * *
[PLAINTIFF ATTORNEY]: ... you mean these figures that you gave a moment ago will be the actual award to her after deduction of her negligence?
THE COURT: No, I wasn't going to assign any percentage uhthose were the figures that I was actually going to award her. [sic] Quite frankly, I've got questions about those figures, ah
[PLAINTIFF ATTORNEY]: You see, what will happen if youif you're assigning twenty-five percent to her, then that's goingwhat you'vethese figures you gave here are going to be reduced
THE COURT: I understand that
[PLAINTIFF ATTORNEY]: Are going to be reduced by another twenty-five percent
THE COURT: I understand that, but I was not going to assign percentages, at the time. Uh, increase by twenty-five percent and I'll award those amounts.
[PLAINTIFF ATTORNEY]: So, in other words, the figures you gave us are after the deductions?
THE COURT: That's right.
[PLAINTIFF ATTORNEY]: O.K.
THE COURT: But I was not going to make any deductions.
[DEFENDANT ATTORNEY]: Just so I can be clear, because I have accountability, the awards the court has cited equals the seventy-five percent which the plaintiff is entitled to recover?
THE COURT: Right. (Paragraphs supplied.)
As we have stated, the trial court did not make specific findings of fact, but apparently concluded that Mrs. Temple did not drive the van on the highway. Where the issues primarily concern credibility and fact, we view the evidence in the light that most favorably supports the judgment because the judgment, and not the trial court's reasons, is what is appealed. A trial court's analysis and application of the law in such instances may be erroneous or leave much to be desired, but we deem that the judgment or ultimate result is founded upon the trial court's weighing and assessing the testimony of live witnesses who are testifying to their perception of the facts out of which the accident arose. Caldwell v. Second Judicial District Indigent Defender Board, 475 So.2d 96 (La.App. 2d Cir.1985), writ denied; Succession of Velasquez-Bain, 471 So.2d 731 (La.App. 4th Cir.1985), writ denied.
Defendants challenge the reliability of plaintiff's witnesses and contend that plaintiff *804 was solely at fault because she drove on the pavement in the face of the favored pickup. Plaintiff counters with the contention that Shannon and his passenger are interested, and are therefore biased, witnesses, and that it should be concluded that she was not at fault because all disinterested witnesses corroborate her testimony that she did not drive the van on the paved highway after she entered the parking lot.

COMPARATIVE NEGLIGENCE
After concluding that Mrs. Temple "has some of the responsibility" for the accident, the trial court assessed her with 25 percent of the fault but did not fulfill its responsibility as the trier of fact and articulate factual and credibility findings in the light of Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985) to support its conclusion.
Comparative negligence has been the law in Louisiana since Act 431 of 1979 and it is, and has been the duty of the judiciary to implement and apply this solemn expression of legislative will, notwithstanding that some judges may disagree with the "theory" and, as here, injudiciously refer to comparative negligence as a "bastard child." Numerous cases have referred to scholarly publications and to annotations of cases under the uniform law that explain how comparative negligence has been interpreted and applied during its long existence in jurisdictions which have never applied the contributory negligence bar.
It is the duty of the trial courts to keep abreast of developments in the law and to apply the law to facts as they arise in disputes presented for resolution. Because this case apparently is this trial judge's introduction to comparative negligence, we shall not remand to compel compliance with the law, but shall apply the law on the record before us in the interest of judicial economy. CCP Art. 2164; Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975).
The allocation of negligence "is not an easy task for the fact-finder." We must consider "both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed." This is accomplished by considering respectively
(1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson, supra, at p. 974.
Accepting the trial court's apparent conclusion that Mrs. Temple did not cross the white painted line and drive into the southbound lane of the highway, we conclude that, in making her U-turn and proceeding northerly, she drove on the shoulder, near the white line, and at times in a direction toward the pavement and when visibility for all traffic was impaired by the rain. She thus created some apparent threat to favored drivers who observed her maneuver and who could not predict whether she would or would not enter onto the pavement.
Shannon testified that he was traveling within the 45 mph speed limit at 30-40 mph. The trial court apparently concluded either that Shannon was driving faster than he said or that a speed of 40 mph in the rain was too fast and unreasonable for the road, traffic, and weather conditions then prevailing. We conclude that he was driving 40 mph or faster and at an unsafe speed in the rain and through the town of Gilbert. In Towns v. Georgia Cas. & Sur. Co., 459 So.2d 124 (La.App. 2d Cir.1984), Mrs. Towns was slightly over the center line of the roadway when she noticed that a truck executing a turn was several feet across the center line 100 or more feet away. We there affirmed a jury's allocation that Mrs. Towns was 10 percent negligent, primarily on expert testimony that she should have seen the truck across the center line when she was 180 feet away and had time to react. We noted that different fact-finders *805 might give a dissimilar apportionment on the same or similar facts and that the apportionment of fault is essentially a factual issue which an appellate court will not disturb in the absence of manifest or clear error.
Shannon obviously had to have been aware of where he was, how fast he was driving, and of traffic, visibility, and weather conditions. He should have adjusted his speed to a degree commensurate with those conditions. There were no extenuating circumstances offered by defendants to explain Shannon's need to drive 40 mph or faster through the town of Gilbert on a rainy day, with vehicles parked relatively close to the paved highway.
Mrs. Temple, on the other hand and under those same conditions, should have been aware that her maneuver toward the highway and along its shoulder could cause a favored driver some apprehension over whether the van was going to enter onto the pavement. Her conduct was not inadvertent, but deliberate and purposeful. She said she made the U-turn to pull into a parking place at the north end of the line of parked vehicles she was circling. Other witnesses, however, said there was no parking place available in that line of vehicles. What she sought (a parking place) was of relatively little significance when compared to the business mission of the pickup on the favored highway. There were no other extenuating circumstances offered to explain her conduct.
We have held that the rule of comparative negligence applies whether or not under prior law the plaintiff's contributory fault was disregarded under doctrines such as last clear chance and sudden emergency that were judicially created to avoid the harsh bar of contributory negligence. Towns, supra.
In summary, we cannot find that the trier of fact was clearly wrong in allocating fault in this instance 75 and 25 percent. Each case must depend upon its own particular circumstances. Shannon's perception that a head-on collision was imminent was patently unreasonable considering that Mrs. Temple was slowly turning, even though towards the highway, and was driving on or near the shoulder. Shannon's reaction, like his speed under the prevailing conditions, was too fast. Compare Ogden v. Dalton, 501 So.2d 1071 (La.App. 2d Cir. 1987) and authorities cited in Towns, supra.

QUANTUM
If our factual review convinces us, upon articulated reasons, that the trier of fact abused its discretion in awarding damages, or failed to make an award for an element of damage, we exercise our appellate power and amend the judgment. Reck v. Stevens, 373 So.2d 498 (La.1979). If the award is abusively low, we raise to the lowest amount we find that the trier of fact could have awarded. If the award is abusively high, we lower to the highest amount we find that the trier of fact could have awarded. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
The accident caused plaintiff headaches and pain in her neck, back, right shoulder and right arm. Her pain became less severe after about three weeks. She was treated by a chiropractor for three months. The chiropractor referred her to a medical doctor to decide whether she needed medical treatment. The medical doctor examined her but did not treat her, and she returned to the chiropractor for treatment. Eventually her headaches and back pain ended, but at trial almost nine months after the accident she testified the headaches had returned and she still had some pain in her shoulder and neck as well as intermittent episodes of involuntary "drawing up" of her right hand and arm.
Before the accident, she was self-employed in a retail furniture store business and lifted and moved heavy objects without difficulty. For the first three weeks after the accident, Mrs. Temple's husband helped her in the furniture store and did the housework. She said she has since improved but has not regained the strength she had before the accident.

CHIROPRACTIC TREATMENT
Plaintiff was billed a total of $2,717 for chiropractic examinations and treatment by *806 Dr. W.R. Webb. He found swelling and muscle spasms in the cervical and lumbar areas of the spine consistent with her complaints of neck, back and shoulder pain. He manipulated the spine to relieve pressure on the nerves. To prepare the spine for effective manipulation, electrical current was used to relieve muscle spasms, and pain and swelling were reduced by the application of hot packs in the cervical area and cold packs in the lumbar area. X rays were taken on the first and last visits.
Initially plaintiff received treatment every day, but the frequency of her visits (29 in all) diminished gradually and she was released from Dr. Webb's care on December 4, 1985, a little over three months after she first saw him. The X rays taken on the last visit confirmed that she was recovering but showed some residual damage which Dr. Webb said could cause her symptoms to recur. She was instructed to return "as needed" according to her symptoms. After Dr. Webb discharged her, she did not seek further chiropractic or medical treatment.
The trial court awarded plaintiff $1,183 for chiropractic treatment and gave no factual basis for his conclusion that the bills totaling $2,717 were "grossly inflated." There is absolutely no evidence in the record to support this conclusion.
An injured party is entitled to choose chiropractic treatment to alleviate his or her symptoms even though this choice may be objectionable to advocates of medical treatment. Druilhet v. Trinity Universal Ins. Co., 361 So.2d 40 (La.App. 3d Cir.1978), writ denied. There is ample argument, but absolutely no evidence, presented by defendants to support their assertion that plaintiff's recovery might have been quicker, cheaper, and more successful if she had been treated by a medical doctor.
Even if a tort victim has incurred expenses for over-treatment by a chiropractor, the tortfeasor is liable for the expenses unless they were incurred by the victim in bad faith. Tyler v. Richardson, 476 So.2d 899 (La.App. 2d Cir.1985), writ denied.
Although defendants and the trial judge think that plaintiff incurred expenses for unneeded treatment, there is no evidence to support this thought and no showing of bad faith on plaintiff's part. She sought treatment shortly after the accident and continued treatments until she was discharged by Dr. Webb about three months later. Dr. Webb explained the different procedures and services for which charges were made.
Dr. Dennie, the medical doctor to whom Dr. Webb referred plaintiff for an examination, did not testify at trial. Defendants ask that we invoke the presumption that his testimony would have been unfavorable to plaintiff. We cannot do so. Dr. Dennie's only contact with plaintiff was based on Dr. Webb's referral for an opinion about whether plaintiff needed medical treatment. Dr. Dennie examined plaintiff but did not treat her. Dr. Webb testified that Dr. Dennie referred plaintiff back to him to continue chiropractic treatment.
Defendants complain that plaintiff should have used her own ice pack or heating pad rather than paying $17 each for cold packs and hot packs she received from Dr. Webb. Initially she purchased a cold pack from the chiropractic clinic and used it at home to reduce swelling so that spinal manipulations could begin. Later charges for cold packs and hot packs were for Dr. Webb's services in applying the packs at the clinic before manipulating plaintiff's spine.
Dr. Webb testified that the charges for each of plaintiff's visits were "routine" for the services rendered. He explained that he could not say whether the total charges for the course of her treatment were "routine" because one patient does not receive exactly the same treatment as another.
There is absolutely no evidence in this record to support the trial court's conclusions that the chiropractor's bill was "grossly inflated ... ridiculous" and that plaintiff was not entitled to recover the entire amount of Dr. Webb's charges. Whatever a judge's personal opinion on any subject may be, a judge is limited in the *807 areas which he may judicially notice and his oath requires him to consciously and conscientiously overcome and guard against any personal prejudices or biases.
We amend the judgment to award $2,717 for the expense Mrs. Temple incurred in obtaining chiropractic treatment, subject to reduction by her percentage of fault.

GENERAL DAMAGES
Mrs. Temple was awarded $1,200 general damages. The reasons for judgment make it clear that this award was influenced by the trial judge's declared personal bias against chiropractors. The judge stated there was no "concrete" evidence to support an award for pain and suffering. Taken in context, this statement must refer to the absence of expert medical testimony. As the trial court noted, the chiropractor corroborated Mrs. Temple's testimony about her pain and suffering. Mr. Temple also corroborated his wife's testimony. Although defendants attempted to minimize the seriousness of Mrs. Temple's injuries by focusing on her failure to see a medical doctor, the evidence supports her claims of injury, pain, and some limitation of her activities as a result of this accident.
The record clearly reveals that the trial court abused its discretion in fixing the general damage award, which is inadequate. We must increase the award to the lowest amount which is reasonably within the trial court's discretion. Coco, supra.
Awards for pain and suffering made to plaintiffs who sustained somewhat similar injuries in automobile accidents and received treatment similar to Mrs. Temple's have ranged from $3,000 to $14,500. We acknowledge that no case is exactly in point and that each case rests on its own facts.
In Mathews v. Hanover Ins. Co., 428 So.2d 1273 (La.App. 3d Cir.1983), the plaintiff sustained injuries to his neck, back, hips and legs, including numbness in his hips and legs. He received chiropractic treatment but still had neck pain and headaches at trial. An award of $14,500 was held not to be abusively high.
Awards to two plaintiffs were appealed as excessive in McCarroll v. Asplundh Tree Expert Co., 427 So.2d 881 (La.App. 1st Cir.1982), writ denied. The court affirmed a $13,000 award to one plaintiff, who was treated by a chiropractor for five months for pain in his neck, right arm and lower back and numbness in his left leg. Treatment relieved the back pain but the neck pain persisted, even after treatment by a medical doctor. The injuries prevented plaintiff from working for over six months and continued to limit his physical activities at home. The court affirmed an $11,000 award to another plaintiff in the same case who was also treated by a chiropractor for about five months for neck pain and headaches. She was later examined by a medical doctor who diagnosed her injury as chronic cervical strain but felt she should not have any permanent impairment. Her household activities were also curtailed.
In Bruins v. United States Fleet Leasing, Inc., 430 So.2d 386 (La.App. 3d Cir. 1983), the plaintiff had cervical sprain with spasm, low back sprain and a thumb injury. At trial she testified she was still having pain. A $4,500 award, challenged as excessive, was affirmed.
The plaintiff in Lee v. United States Fidelity & Guar. Co., 433 So.2d 903 (La. App. 3d Cir.1983), originally had acute cervical and lumbar strain. Seven weeks after the accident he still had back spasms, and nine months after the accident he still had mild back sprain. At trial he testified his back hurt when he did lifting required by his work as an electrician's helper. A $4,000 award was not abusively high.
Both plaintiffs in Tyler v. Richardson, supra, were treated by chiropractors for about seven months, but the evidence supported the trial court's finding that their soft tissue injuries were not serious and caused substantial discomfort for only a few weeks after the accident. The plaintiff whose injuries were more extensive was awarded $3,750. The other plaintiff, who had less severe physical injuries but had worry about her unborn child, was awarded $3,000. Both awards, challenged as inadequate were affirmed.
*808 Based on the evidence in this record, we find $3,500 would be the lowest amount that a trier of fact could have awarded for Mrs. Temple's pain and suffering. We amend to increase the award to that amount, subject to reduction by her percentage of fault.

PROPERTY DAMAGE
Mrs. Temple's 1977 Chevrolet van was a total loss. She testified she had agreed to sell the van to her mother for $3,000 just before the accident. Mr. Temple, who was in the used car business, testified he valued the van at $3,000 before the accident. Another witness who testified the van was probably worth $2,800 $3,000 before the accident admitted that he gave only a repair estimate on it and did not attempt to calculate its actual cash value before the accident. He said the way to calculate that figure would be to describe the van to dealers who sell that type of vehicle and find out what they would sell it for.
Defendants' appraiser inspected the van after the accident and gave both a repair estimate and an estimate of the pre-collision value. His personal opinion of the value was $1,500 but he also obtained three quotes from used car dealers based on his description of the van as being "in a good average condition, with average mileage." The actual mileage was not shown. The quotes averaged $2,333.33. From this figure the appraiser subtracted $663 as the total of pre-existing damage to the van. His estimate of the van's pre-collision value was $1,670.33, and the trial court awarded this amount for property damage. The appraiser calculated the salvage value of the van as $410 but the trial court did not deduct the salvage value from the property damage award. Defendants do not complain about this award, but instead ask that the trial court's awards be affirmed. We shall not, in these circumstances, modify the award.

REDUCTION OF AWARDS BASED ON COMPARATIVE FAULT
Although the trial judge stated at one point that his damage awards reflected the deduction for Mrs. Temple's percentage of fault, a reading of his reasons for judgment shows that the amounts he ultimately awarded were calculated before he made the decision to assign a portion of fault for the accident to Mrs. Temple. In other words, he announced the awards to which he felt she was entitled if she were not at fault, and then he assigned 25 percent fault to her, but he stated he would increase his awards by 25 percent so she would get the amounts he had already announced. This approach is clearly contrary to CC Art. 2323. We shall amend our judgment to reduce Mrs. Temple's awards by 25 percent, the degree of her comparative negligence which we have affirmed.

DECREE
The judgment appealed is amended and recast to allow plaintiff medical expenses of $2,717, property damages of $1,670.33, and general damages of $3,500, which are reduced by 25 percent to $2,037.75, $1,252.75 and $2,625.00 respectively, with legal interest from judicial demand.
As amended, the judgment is affirmed. Costs of appeal are assessed 25 percent to plaintiff and 75 percent to defendants.
AFFIRMED, AS AMENDED, and RECAST.