530 So.2d 1294 (1988)
Theodore James ALLEN and Kija Claire Love Allen, Plaintiffs-Appellees Appellants,
v.
Gerald L. BURNETT and Marsha Elliott Burnett, Defendants-Appellants Appellees.
No. 19842-CA.
Court of Appeal of Louisiana, Second Circuit.
August 17, 1988.
Rehearing Denied September 21, 1988.
*1295 Davidson, Nix & Arceneaux by M. Thomas Arceneaux and Mark E. Robinson, Shreveport, for Burnetts.
Evans, Feist & Mills by George H. Mills, Jr., Shreveport, for Allens.
Before HALL, MARVIN and SEXTON, JJ.
MARVIN, Judge.
In this action provoked by the foreclosure of residential and farm property sold by credit sale, the sellers and the buyers appeal a judgment, which, on the main demand, cast the buyers for $141,997 plus interest and attorney fees, and which allowed a credit on the reconventional demand in quanti minoris in favor of the buyers for $13,648 with interest. The judgment also recognized the vendor's lien or mortgage of the seller on the property and assessed costs equally to buyers and sellers.
The buyers, in 11 specifications of error, essentially assert that the "delinquent charge" provided in the mortgage note should be assessed only on each past due installment of that note, that greater damages should have been allowed in quanti minoris, and that some damages should be allowed for "wrongful seizure."
The sellers, in five specifications, contend that the buyers' action in rehibition was prescribed or was not proved, that attorney fees should be increased to the amount provided by the note, and that court costs should not have been assessed one-half to each litigant.
The trial court, noting "voluminous filings," labelled the dispute "a legal potpourri..." and concluded that buyers' reconventional demand in redhibition was "in response" to the foreclosure which sought "to offset the [sellers'] valid claim against them." These conclusions are fully supported by the record.
With some amendment with respect to attorney fees and costs, we affirm the judgment which is appealed. See Temple v. Shannon, 505 So.2d 798 (La.App. 2d Cir.1987).

FACTS
The October 1, 1981, sale of the 22-acre tract between two married couples, was *1296 negotiated primarily by the husbands, Col. Allen, a retired military officer without legal training or experience, and Mr. Burnett, a Shreveport lawyer engaged in private practice who was experienced in real estate transactions, bankruptcy, and tax law.
The Burnetts became social friends of the Allens during the negotiations of about two months duration. Burnett drafted the deed and the notes in question here and "closed" the transaction in his office. He argues that the language he used to set forth a "delinquent charge" in one note is patently ambiguous and that parol evidence of the true and common intent of Allen and himself should cause us to grant him the relief he seeks on appeal. The trial court admitted such evidence but weighed it against Burnett. Burnett's August 17, 1981, letter proposal before the sale and other correspondence between Burnett and Allen after the sale was consummated supports the trial court's judgment.

THE TWO NOTES
At closing on October 1, 1981, Burnett paid Allen $10,000, assumed the balance owed on Allen's mortgage indebtedness to the Federal Land Bank, and drafted and signed two negotiable promissory notes which were to be held by Allen. One note for $18,011 bore no interest, was unsecured, and was made payable May 1, 1988. The unsecured note represented interest that was "precalculated" or "deferred" to allow some advantage, in Burnett's opinion and Allen's understanding, under the federal income tax law.
The second note was a secured vendor's lien or mortgage note for $125,000 at 6½ percent per annum interest from date. This note was payable in installments, the first of which ($25,000) became due on April 1, 1982. The remaining installments were due in five annual payments of $20,000 each on May 1 of each of the years 1983 through 1987. The penalty provision is contained in that note. Application of the penalty or delinquent charge in the event of Burnett's failure to timely pay is much disputed here and in the lower court.
Burnett's 1981 letter proposal to Allen also sheds light on the $18,011 note. Burnett asserts that if he had timely paid the indebtedness as it became due he would have paid only the principal of the two notes ($143,011). Allen asserts that if timely payment had been made, Burnett would have paid $143,011 plus 6½ percent interest on $125,000, the interest amount of which (6½ percent on $125,000 plus the $18,011 precalculated interest) would approximate the 13 plus percent interest then being paid by banks on a certificate of deposit.

NEGOTIATIONS
According to Burnett's 1981 letter, Allen apparently had offered to sell the property for $193,725 cash ($189,000 plus one-half of the realtor's fee). Burnett proposed in his letter to pay exactly that, but on credit terms. Burnett's letter speaks of the rate of interest discussed by Allen and his banker and the fact the prime rate was above 12 percent.
We reproduce the August 17, 1981, letter:

*1297 
*1298 
At this juncture we observe that the consummated transaction was similar to Burnett's August 17, 1981, letter proposal, which mentioned and corresponded to Allen's prior offer. Burnett paid the $10,000 at closing and assumed the balance due on the FLB mortgage indebtedness. He combined the $25,000 "due on or before six months from occupancy" with the $100,000 due in installments, which he had proposed in the letter, into the $125,000 secured note that was executed at closing. Burnett executed the unsecured "interest" note for $18,011, but did not explain how his proposed $19,500 accrued interest on the $100,000 indebtedness was converted to the $18,011 amount of the note. Burnett calculated 6½ percent interest on the $100,000 in his proposal to be $19,500. In any event the "accrued interest" unsecured note and the 6½ percent per annum interest from date provided for in the $125,000 note approximates the then 12 plus percent prime rate mentioned in Burnett's 1981 as being discussed by Allen and his banker.
We reproduce here the two notes:
*1299 
*1300 
CIRCUMSTANCES AFTER CLOSING
Burnett paid on the secured note on six occasions, none of which was timely, a total of $75,000, as shown by this tabulation of the due dates, amounts, and payment dates:

DUE DATE AMOUNT PMT.MADE AMOUNT
4/1/82 $25,000 12/17/82 $25,000
5/1/83 $20,000 8/19/83 $ 5,000
 12/05/83 $10,000
 2/10/84 $15,000
5/1/84 $20,000 11/16/84 $10,000
 02/12/85 $10,000

Burnett and Allen were apparently on good terms through 1982 even though the initial installment, due April 1, 1982, was not paid until 8½ months later, on December 17, 1982. In his transmittal letter of December 17, 1982, Burnett wrote the Allens:
[My wife] and I both appreciate the support you have given ... if ever we can reciprocate you have only to call anytime... Truly you are one of the only real friends we have, with a capital "Friend."
We look forward to visiting with you during the holidays ...
Burnett added this handwritten note to the typewritten letter:
P.S. I'll send the interest check as soon as [the Commercial National Bank] calculates what the amount will be.
Burnett did not mail the "interest" check for $5,000 until August 19, 1983. Allen applied this check to the penalty. Burnett now raises the issue of whether the "interest," as he referred to it in the above quote, or the "delinquent charge" as he referred to it in the $125,000 note, applies separately to each past due installment (as he contends), or whether it applies the principal indebtedness of $143,011 (as Allen contends).
We agree that Burnett's language in the second note clearly imposes a delinquent charge on the principal indebtedness that is represented by the principal of the two notes. We emphasize what Burnett provided in the note:

*1301 ... in that event [my failure to pay any installment when due ...] then

each and every note shall [be] deemed to be delinquent and shall bear interest thereon as a delinquent charge ...

and in the event all accrued interest, delinquent charges, and principal is not paid on or before six months from the due date of said note(s) [parentheses are Burnett's] then same shall be in default, and

all accrued interest, delinquent charges, attorneys fees, and principal shall immediately become collectible at the option of the holder of the note.

Comment: only the second note was payable in installments. The unsecured note did not provide for interest, for delinquent charges, or for the six-months default period.
Almost three years after Burnett's "friendship" letter of December 17, 1982, Allen's attorney wrote Burnett a letter on February 14, 1985, demanding that both notes and the interest, penalty, and attorney fees be paid. Burnett's declarations of friendship then ceased. He had mailed Allen $10,000 on February 12. He responded to Allen and Allen's attorney that if the demand letter "reflects your current position... then let's get on with the proceeding... I ... further assure each of you that whatever sums of money, if any, ever paid to an attorney [by me] will in fact be well earned."
Notwithstanding frequent correspondence and contact between Allen and Burnett from 1981 to February 1985, Burnett had not mentioned redhibitory defects in the property. After the foreclosure action was instituted March 6, 1985, Burnett reconvened, alleging 14 specific defects, 10 of which the trial court either found not proved or discoverable by simple inspection.
The trial court initially thought the penalty provision of the secured note was ambiguous, but after reflection found that it was not, or that, in any event, it should be construed against Burnett who drafted it. We affirm the trial court's judgment assessing the penalty on both notes.
The record is replete with various sums respectively reached by the parties, their counsel and experts, about the method, when, on what, and how, to calculate the penalty. Allen contends the penalty provision is not ambiguous. Burnett contends that it is.
This basic disagreement became apparent at closing. Allen testified that at closing he stated that delinquency charges would run against the $18,011 note. Burnett responded that a person could not collect interest on interest. Allen explained that he did not view the language in question as interest, but as a penalty based on an interest rate. Allen, and perhaps Burnett, too, being eager to conclude the sale, did not attempt to resolve the dispute which later became acute.
Correspondence after October 1, 1981, also revealed the disagreement as to what, how, and when the penalty would be applied. The first time the penalty was applied the parties disagreed. Burnett's letter of July 15, 1983, which refers to Allen's letter of July 2, 1983 (no copy was produced at trial), states:
"I calculate the interest payment differently than you ... Since the increased interest rate was a late charge on the amount due, it seems to me to apply [only] to the $25,000 and not the principal balance ..."
In a November 8, 1984, letter to Burnett, Allen calculates the penalty on the outstanding principal balance. Burnett's November 16, 1984, response questions, and defers further argument about, Allen's penalty calculation.
I shall forward the remaining $10,000 plus interest on the $20,000 as soon as it is approved and received. If you desire as we did last time and before, that the interest be calcualted on the outstanding principal, then I will also pay this amount and ultimately deduct this amount from final interest payments.
Burnett vigorously contends that penalties should not accrue against the outstanding balance because "interest" was already provided in the $18,011.71 note due May 1, *1302 1988. He overlooks the fact that he provided that the $125,000 note bore interest from date.
Moreover, Burnett overlooks his August 17, 1981, restatement of Allen's proposal which impliedly suggests that Burnett pay "bank" or prime interest (more than 12 percent) on the indebtedness.
Penalties, distinct and separate from interest, were expressly provided by Burnett in the event he failed to timely pay an installment payment as stipulated in the secured note. Burnett did not make any payment on time. Burnett attempts to explain that the penalties were designed to compensate Allen income that he might lose if timely investment of each annual installment were not made. While Burnett's position is tenable and perhaps what he intended, neither the language of his August 17, 1981, letter or the note which he prepared, nor his intention, avails Burnett.
Burnett argues a "straightforward" or "common sense" interpretation of the quoted language would result in finding "... after the due date of an installment, interest would run on that installment at the certificate of deposit rate offered by Commercial National Bank in Shreveport on the [due] date of the installment." Such an interpretation would render meaningless, however, the distinction Burnett made in the note: "... [upon] the failure to pay any installment when due, ... each and every note shall be deemed delinquent and shall bear interest thereon as a delinquent charge ..." The words "each and every note" would have to be read to mean each "overdue installment," contrary to the rules of contractual interpretation.
Words of a contract must be given their generally prevailing meaning. CC Art. 2047. Burnett used "note" in a sense different from "installment." We reiterate that Burnett wrote the holder of the note (providing the penalty) had the option to enforce the penalty if the maker failed to pay an installment (on the note) and that the failure to timely pay the installment would make every note delinquent and subject to the penalty. Burnett also provided that if the delinquent charge s were not paid within six months, the notes would be in default and all interest, delinquent charges, attorney fees, and principal shall immediately become collectible.
Burnett, in brief, makes much argument about Allen's alleged "inconsistencies" in calculating penalties. Allen agreed that the penalty was to compensate for late payment. Contrary to Burnett's argument, however, Allen did not testify or agree that the penalty was to compensate solely for the late payment of an installment. Burnett further incorrectly states in his brief that Allen "expected" to receive a late charge on each installment as compensation for late payment. Burnett refers to this testimony by Allen:
Q.: Now, as regards to this $5,000 check, dated August 19, 1983, to what did you attribute that payment?
A.: That payment was part of the delinquent charge due on the date $25,000 first payment due.
This single quote does not support Burnett's contention, especially when it is read with all other testimony and in light of the correspondence between the parties.
Even should we ignore the record and the February 14, 1985, demand letter and agree with Burnett that Allen claimed penalties, before instituting foreclosure only on the principal balance of the $125,000 note, and, after foreclosure, on the principal balance of the two notes, we cannot agree with Burnett's primary contention that the penalty applied separately to each installment when it became past due.
When the credit sale was consummated or "closed," Allen contended that the penalty was not interest and would apply even to the $18,011 note. See discussion, supra. At all times thereafter Allen consistently contended that the penalty was owed, not on the past due installment, but on the principal indebtedness. Burnett acknowledged and disagreed with Allen's position in his November 16, 1984, letter to Allen:
If you desire as we did last time and before, that the interest be calculated on the outstanding principal ...
*1303 The trial court correctly concluded that the penalty provision in the $125,000 note clearly and unambiguously applied to both notes Burnett executed, impliedly accepting Allen's understanding and discounting Burnett's explanation of what he intended or understood. There is no clear error in these conclusions.

SCOPE OF REVIEW
Interpretation of contracts is governed by CC Arts. 2045-2057, as revised in 1984. Former CC Arts. 1945-1962. Burnett's statement in brief that the revisions do not change the law is too broad. While correct as to most articles, the differences in two applicable articles are set out below. CC Art. 2053 provides:
A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties.
The comments note this is a new article which reproduces the substance of and enlarges upon the provisions of former CC Arts. 1903, 1953 and 1965 (1870) which we reproduce,
The obligation of contracts extends not only to what is expressly stipulated, but also to everything that, by law, equity or custom, is considered incidental to the particular contract, or necessary to carry it into effect. CC Art. 1903 (1870)
Whatever is ambiguous is determined according to the usage of the country where the contract is made. CC Art. 1953 (1870)
The equity intended by this rule is founded in the christian principle not to do unto others that which we would not wish others should do unto us; and on the moral maxim of the law that no one ought to enrich himself at the expense of another. When the law of the land, and that which the parties have made for themselves by their contract, are silent, courts must apply these principles to determine what ought to be incidents to a contract, which are required by equity. CC Art. 1965 (1870)
CC Art. 2056, in part, states:
In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text.
The comments make it clear that Art. 2056 is the codification of the long standing jurisprudential rule that any ambiguity or doubt about the meaning of contractual language is resolved by interpreting the contract against the party who prepared it.
In Lambert v. Maryland Cas. Co., 418 So.2d 553 (La.1982), Justice ad hoc Hall discussed contractual interpretation:
Contracts must be construed in such a way as to lead to logical conclusions and to give effect to the obvious intentions of the parties ... They must be interpreted in a common-sense fashion, according to the words of the contract and their common and usual significance ... A cardinal rule in the construction of contracts is that the contract must be viewed as a whole and, if possible, practical effect given to all its parts, according to each the sense that results from the entire agreement so as to avoid neutralizing or ignoring any of them or treating them as surplusage. Some effect is to be given to every word or clause if possible for a court may not impute to the parties the use of language without meaning and effect ... When there is doubt as to the true sense of the words of a contract, they may be explained by referring to other words or phrases used in the same context.... Terms that present two meanings must be taken in the sense most congruous to the matter of the contract.... Lambert, supra, at pp. 559-560 (citations omitted.)
The trial court admitted parol evidence to determine the common intent of the parties. The court heard much testimony of what was intended or understood by Allen and Burnett. Neither litigant complains on appeal that parol was admitted, even though the trial court concluded after parol was admitted that the penalty provision *1304 was not ambiguous or doubtful. The issue of whether parol should have been admitted is not squarely at issue. The trial court considered parol before drawing its conclusions that the penalty applied to both notes. We have also considered the parol evidence and agree with the trial court's conclusion.

QUANTI MINORIS
Both Allen and Burnett complain of the award in quanti minoris which allowed damages in part for only four of the 14 alleged defects:

foundation $10,000
gas line 448
upstairs bath 3,000
electrical wiring 200
 _______
 $13,648

Louisiana law provides for a reduction in the purchase price on account of some vice or defect in the thing sold that existed at the time of sale. Plaintiff bears the burden of proving the vice or defect existed at the time of sale. Truelove v. Easley, 521 So.2d 1229 (La.App. 3d Cir.1988).
A plaintiff must also prove that the defect could not have been discovered by ordinary inspection. Reynoir v. Succession of Hero, 513 So.2d 405 (La.App. 4th Cir.1987). Ordinary inspection does not mean a detailed examination or dismantling that might deface the thing purchased. Sievert v. Henderson, 506 So.2d 743 (La. App. 1st Cir.1987). See Pursell v. Kelly, 244 La. 323, 152 So.2d 36 (1963).
Generally, when quanti minoris is applicable and a reduction of purchase price is granted, the correct measure for the award is the difference between the sales price and the price a reasonable buyer and seller would have agreed upon had they known of the defects. In actions for quanti minoris involving the sale of realty, the supreme court has noted this variation to the general rule:
In our recent cases ... it has been concluded that, in actions for quanti minoris involving the sale of realty, the measure of recovery is the amount necessary to convert the unsound structure into a sound one. The reason given for this exception is that the usual rulethat the measure of recovery is the difference between the value of the thing sold in its defective condition and its value as warranted...cannot be applied in cases of this sort inasmuch as the difference in value of real estate is not readily or easily ascertainable unless there has been an immediate resale of the property. Pursell v. Kelly, supra, 152 So.2d at p. 39. Emphasis added and citations omitted.
See also Truelove v. Easley, supra, and Smith v. Chang, 467 So.2d 1277 (La.App. 4th Cir.1985).
Sievert v. Henderson, supra, citing Pursell, discussed the duty of the buyer to inspect. Prior to purchase the buyers had noticed an interior door propped open and cracks outside a shower stall and beneath windows in a bedroom. When questioned, the seller replied, "If you have lived in the New Orleans area, you know all houses nineteen years of age all settle."
The proper test to be applied in cases of this kind is whether a reasonably prudent buyer acting under similar circumstances would have discovered the differential settlement problem prior to the act of sale. See Pursell, 152 So.2d at 41. We find that plaintiffs' observations of the cracks, along with Mrs. Henderson's declaration as to the settling of all houses that age, should have put plaintiffs on notice that a problem may exist with the house. The settling was evidenced by the cracks and failure of the doors to close properly. It therefore became plaintiffs' duty to make further investigation. When the defect complained of is partially apparent, the buyer who, nevertheless, purchases the thing without further investigation must be held to have waived his right to use in quanti minoris. Pursell, 152 So.2d at 41. Sievert v. Henderson, supra, at p. 745.
As in Sievert, a buyer was denied quanti minoris recovery for a defective foundation in Mintz & Mintz Realty Co., Inc. v. Sturm, 419 So.2d 981, 985 (La.App. 4th Cir.1982), writ denied. Several apparent defects existed: front steps had pulled away from the house, cracks were visible *1305 in the stucco exterior, there were uneven interior floors, and damaged piers were visible by parting dense foliage. The court found the buyer could have discovered the defect in the foundation by simple inspection. Quanti minoris was denied.
The ultimate question of the existence of a redhibitory vice is a question of fact for the trial judge. Sievert, supra. Where a redhibitory vice is found, the trial judge has wide discretion to determine the award in quanti minoris. Smith v. Chang, supra.
The record does not support Burnett's assertion that the award in quanti minoris is inadequate. Clearly, Burnett knew he was buying a 40-year-old house long past its prime and in need of many repairs, structural and otherwise. Burnett admittedly made only a cursory examination of the house prior to signing the purchase agreement because his stated interest was in negotiating the credit terms. He acknowledged that in negotiating with Allen, however, he considered:
the age of the house;
cracks in the pool decking;
patched cracks in the exterior brick veneer;
two open cracks in the exterior brick veneer;
cracks in the garage floor; and
front porch separated from and leaning away from the house.
Burnett admitted that, at the time of the sale, he joked about bulldozing the house.
A prudent buyer would not have ignored the numerous "cracks" which Burnett saw and considered.
In light of expert testimony, we cannot, however, say the trial court was clearly wrong, or abused its discretion, in awarding some credit in the quanti minoris for the foundation, bathroom, gas line and wiring. We adopt these conclusions of the trial court with respect to the defects alleged:
The [Allens] contend that the Burnetts did not prove that the vices of which they complain existed at the time of sale, or, in the alternative, if these vices were existent, they were known or should have been known to the Burnetts. As stated previously, the Burnetts did satisfy their burden of proof as to some, but not all, of their complaints. While the Allens' home as purchased was not necessarily a "handyman's delight," neither was it the homeowner's nightmare the Burnetts have alleged.
Thus, the Court herewith considers each alleged redhibitory defect and the amount of recovery allowed.
1. Foundation. $10,000,000.
The Burnetts asked $46,000.00 for foundation repairs, which the Court has reduced considerably. It is clear that there were problems with the foundation that were not apparent until after the sale. Recovery is necessitated by this classic redhibition scenario: the faulty condition could not have been ascertained on simple inspection.
Nonetheless, in reducing the amount of the Burnetts' recovery, the Court looks to Primm, supra. In that case, certain environmental features caused the foundation's upheaval, which appears to be the case here. However, this Court is convinced that the Burnetts would not have purchased this home had they known at the outset what they know now.
Costs of stabilization and revamping of the drain installation are the bases for this damage award; the Court believes $10,000.00 should be adequate to provide the Burnetts with a foundation equivalent to what they believed had been purchased.
2. Swimming pool. No recovery.
The evidence shows that the problems with the pool were readily observable at the time of purchase, and that the Burnetts were aware of them; hence, they were neither hidden nor non-apparent....
3. Gas line. $448.00.
The Burnetts demonstrated to the Court's satisfaction that the necessity of replacing the gas line was due to inherent problems with the system at the time of purchase.
4. Plumbing. No recovery.

*1306 The Burnetts did not carry their burden of proof as to the inadequacy of the plumbing. Although there were problems that arose sometime after purchase, they were not shown to have existed at the time the Allens had the house, nor for some months following the Burnetts' taking possession. Most importantly, the Burnetts waived their right to complain, according to the language of the sales agreement.
5. Upstairs bathroom. $3,000.00.
Some recovery is allowed here, and the Court is granting two-thirds of that requested. It appears that the Burnetts and Allens were both at fault, insofar as the Burnetts aggravated an already-defective situation.
6. Handrail on the stairs. No recovery.
This was insignificant to the quanti minoris action; indeed, no evidence as to this alleged defect was presented at trial.
7. Front door. No recovery.
Simple inspection by the Burnetts would have revealed that the door was nailed shut, which surely should have raised some questions in their minds.
8. Water in garage. No recovery.
The Court is satisfied that the water accumulation is a result of geographical factors, which the Burnetts could have seen for themselves at the outset.
9. Dishwasher. No recovery.
Reasonable inspection should have revealed any problems with the dishwasher; again, the Burnetts waived their right to complain according to the purchase agreement.
10. Septic tank. No recovery.
No evidence was introduced at trial.
11. Electrical wiring. $200.00.
This is a sufficient award, based on repairs done by Mr. Burnett, Sr. The evidence clearly indicated that he is entitled to some recovery on this item.
12. Downstairs bath. No recovery.
This Court was not persuaded that the downstairs bath was fraught with hidden defects at the time of purchase in 1981.
13. Facia boards. No recovery.
Inspection should have sufficed here; there was also persuasive evidence that the Burnetts contributed to this problem.
14. Other items: alternator, tractor, swimming pool pump and filter. No recovery.
There was no evidence offerred.
TOTAL RECOVERY: $13,648.00.
In summary, the Burnetts are entitled to quanti minoris as outlined above. Although it is true that Burnett recognized and acknowledged some problems at the beginning, the Court holds that the Burnetts would not have purchased the home if they had known of what have been proven to be these hidden, non-apparent defects.

COSTS
The Allens complain that costs should not have been assessed one-half to them.
Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause.
Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable. CCP Art. 1920. (Emphasis added.)
Assessment of costs, of course, is within the discretionary authority of a trial court.
When a prevailing party, here Allen, is taxed with costs of litigation, it is usually because that party incurred pointless additional costs or engaged in conduct which justified the assessment against the prevailing party. Johnson v. Hendrix Mfg. Co., Inc., 475 So.2d 103 (La.App. 2d Cir. 1985). Allen argues he and his wife are blameless in this regard and asserts that Burnett is being allowed to carry out his threat to make the Allens' attorneys earn every penny that Burnett might be ordered to pay.
We agree with Allen. Under the circumstances of this record, we must find the trial court abused its discretion in assessing one-half of the costs against the Allens. Compare Ritchie v. S.S. Kresge Co., Inc., 505 So.2d 831 (La.App. 2d Cir.1987), writ denied. Allen prevailed in all of his demands. *1307 Burnett prevailed only in part and produced no evidence to support many of the 14 redhibitory defects he alleged. He wrote the language in the note which produced voluminous testimony and argument. As an attorney, he is presumed to know the law and the principles under which courts interpret contracts. We shall amend to reassess costs.

ATTORNEY FEES
The Allens complain that the attorney fee award by the trial court of 15 percent of the judgment should be increased to the 20 percent provided in the notes. The Burnetts counter there is no competent proof concerning the time spent by the Allens' attorneys. Neither argument has merit.
Courts may inquire into the reasonableness of legal fees. The prohibition against excessive attorneys fees cannot be avoided by fixing the amount of attorneys fees as a percentage of the amount to be collected on a note. Leenerts Farms, Inc. v. Rogers, 421 So.2d 216 (La.1982). See also Central Progressive Bank v. Bradley, 502 So.2d 1017 (La.1987).
This court recognizes that trial courts have much discretion in awarding attorney fees. Tide Craft, Inc. v. Red Ball Oxygen Co., 514 So.2d 664 (La.App. 2d Cir.1987), writ denied.
The record discloses no abuse of discretion by the trial court in fixing the fee at 15 percent for services rendered in the trial court. We shall increase the award, however, to allow a reasonable fee for professional services rendered on appeal with respect to the main demand only. Considering the briefs and reply briefs and argument, we deem $2,500 is a reasonable fee for the service of Allen's attorney on appeal.

QUANTI MINORIS PRESCRIPTION
Referring to the Long Arm Statute, LRS 13:3201, the Allens complain the trial court erred in overruling their exception of prescription to the Burnetts' claim of redhibition and in finding the third paragraph of CC Art. 2534 constitutional as written and applied.
The redhibitory action must be instituted within a year, at the farthest, commencing from the date of sale.
This limitation does not apply ...
(3) ... where the seller, not being domiciled in the State, shall have absented himself before the expiration of the year following the sale; in which case the prescription remains suspended during his absence. CC Art. 2534. Our emphasis.
Shortly after the sale, the Allens left Louisiana and became Texas residents. The Allens argue that paragraph 3 of CC Art. 2534 should not suspend prescription because they could have been served under the Long Arm Statute and because they retained a real or secured right in the property. The Allens say they were therefore "present" in the state.
Additionally, Allen asserts that the quoted language of Art. 2534 violates LSA-Const. Art. 1, §§ 3 and 4, and U.S. Const. Art. 4, § 2, and the Fourteenth Amendment by denying him equal protection of the laws, and has a chilling effect on those persons who comprise a disadvantaged class because they exercise their privilege to dispose of property and move out of state. The Allens found their federal constitutional claim on the contentions that they are members of a suspect class and that CC Art. 2534 has no rational basis or relation to a legitimate government interest. We find no merit in either contention.
The Burnetts could have served the Allens in redhibition under the Long Arm Statute (LRS 13:3201) to obtain jurisdiction. See Mayeux v. Hughes, 333 So.2d 273 (La. App. 1st Cir.1976). This fact does not prevent the application of the suspension provided by CC Art. 2534(3). A Long Arm Statute does not repeal or modify a statute such as paragraph 3 of CC Art. 2534. See G.D. Searle & Co. v. Cohn, 455 U.S. 404, 102 S.Ct. 1137, 71 L.Ed.2d 250 (1982).
In G.D. Searle & Co., supra, a New Jersey statute provided for the interruption *1308 of the statute of limitations against a foreign corporation unrepresented in the state. New Jersey also has a long arm statute. The court noted that service of process under the long arm statute could be more difficult and time consuming. The statute tolling the New Jersey statute of limitations, therefore, was found to have a legitimate state objective and not to deny equal protection.
Paragraph 3 of La.CC Art. 2534 suitably furthers a similar legitimate state interest of preserving redhibitory actions against non-residents and does not violate the federal or state constitutions. Although the Allens' location was well known, the statute protects against the opposite circumstance where the seller cannot readily be located.

OTHER ASSIGNMENTS OF ERROR
Burnett's complaint concerning the trial court's refusal to permit the deposition of the attorney, Paul Adkins, who wrote Allen's demand letter, is groundless.
No attorney of record representing the plaintiff or the defendant shall be deposed except under extraordinary circumstances and then only by order of the district court after contradictory hearing. CC Art. 1542
Interrogation about Adkins' calculations would have produced nothing but argument, since both litigants and their witnesses demonstrated different methods of calculations.
Also groundless and unsupported by authority is Burnett's assertion that the trial court erred in ruling irrelevant, questions to Allen concerning his need for cash arising from his purchase of property and construction of a home in Texas. Even should we assume the trial court's ruling is incorrect, we do not reverse where the fact or admission sought is otherwise in evidence and is not contested. Allen's correspondence expressly shows his need for cash.
We also find the trial court did not err in allowing Allens' expert to answer how he interpreted the note when he calculated the penalty.

THE ALLEGED WRONGFUL SEIZURE
Under executory process, Allen obtained a writ of seizure and sale of the property on March 6, 1985. Burnett then countered and sought to enjoin executory process on the grounds that Allen did not "own" the mortgage note because it had been endorsed by Allen:
Pay to order of Lockhart Savings & Loan Association as Collateral in accordance with collateral transfer of the note dated December 15, 1983.
The trial enjoined executory process on the basis of the endorsement and reserved until later any determination of damages or whether the seizure was wrongful.
Allen converted his foreclosure to one by ordinary process and showed that he borrowed $14,000 from Lockhart Savings and Loan in 1983 and repaid the loan on February 14, 1984, more than a year before executory process was instituted at a time when Allen held the note. At all times, in any event, Allen was the "owner" of the note even when it may have been pledged to Lockhart. LRS 10:3-208 controls. Lockhart's endorsement was not necessary for Allen's re-acquisition of the note. The endorsement, even though not formally stricken or cancelled, was not an impediment to executory process. See Wood v. Tyson, 13 La.Ann. 104 (La.1858).
Moreover, CCP Art. 2751, which gives the trial court discretion to enjoin executory process and award damages for wrongful seizure, does not mandate damages in every case where the injunction issues. The comments under the article expressly state
[This article] is not intended to require that damages and attorney's fees be awarded in every case where an injunction is issued, for example, where an injunction is issued because of technical deficiency or a technical error.
The trial court correctly denied Burnett's claims for attorney fees and damages for the alleged wrongful seizure.

DECREE
The judgment is amended to award plaintiffs $2,500 additional attorney fees for services *1309 rendered them on appeal with respect to the main demand and to cast defendants for all costs, here and below.
As amended, the judgment appealed is AFFIRMED.

ON APPLICATION FOR REHEARING
Before HALL, MARVIN, SEXTON, NORRIS and LINDSAY, JJ.
Rehearing Denied.