747 So.2d 503 (1999)
Timothy W. KITE d/b/a Timothy Kite Enterprises
v.
GUS KAPLAN INC. and Gustave Kaplan.
Gus Kaplan, Inc.
v.
Timothy Kite Enterprises.
Nos. 98-C-0715, 98-C-0751.
Supreme Court of Louisiana.
November 17, 1999.
Rehearing Denied January 7, 2000.
*505 J. Morgan Passman, Walker, Passman & Michiels, Alexandria, Edward A. Kaplan, Alexandria, for Applicant.
Cary Brian Bryson, Robert Murray Mahony, Lafayette, Harry Lawrence Shoemaker, III, Baton Rouge, for Respondent.
LEMMON, Justice.[*]
This is an action by the lessee of space in a department store, leased for the operation of a fine jewelry department, against the store's corporate owner and its chief officer for damages for breach of the lease and for wrongful eviction. The principal question is whether the store owner's contractual authority to change the "space" of the fine jewelry department permitted the owner to remove the jewelry from that complex's many locked display cases and drawers, overnight and without prior notice, and to offer the lessee in its place a small complex of non-lockable showcases designed for clothing display and sales. We conclude that, despite the highly factual nature of this case and the unsympathetic nature of the lessee's claim, the lessor's unilateral relocation of the jewelry department from a superbly furnished and finished complex to an unfinished complex that was not comparable to that in the original location constituted a failure to maintain the lessee in peaceable possession and rendered the lessor liable for damages. On significant secondary issues, we further conclude that the damages awarded by the court of appeal were excessive and that the lessor's insurance policy covered its liability for these damages.

Facts
Gustave Kaplan, with fifty years of experience in the department store business as of time of trial, formed Gus Kaplan, Inc. (GKI) in 1967. As president of GKI in 1988, Kaplan was negotiating the lease of an Alexandria building that D.H. Holmes Co. had used as a department store. During the course of the negotiations, Timothy Kite, a 1986 high school graduate with certificates earned by early 1988 from the American Gemological Institute in diamonds and diamond grading, gemology and fine jewelry making and repair, approached Kaplan about operating a fine jewelry department in GKI's intended new location.
Kaplan and Kite had discussions from time to time over the next three years, during which Kite worked in his fields as an employee for others. Kite wanted to run a fine jewelry department for GKI as an employee, and Kaplan wanted a department run by Kite, but did not want to pay the salary that Kite wanted. On the other hand, Kite did not have the money to establish and stock his own fine jewelry department in the store, as Kaplan preferred. To solve Kite's money problem, Kaplan personally loaned Kite $25,000, interest free, and helped Kite obtain a $185,000 Small Business Administration loan with personal letters of recommendation to Kaplan's bank and a waiver of GKI's lessor's privilege.[1]
On August 3, 1992, GKI and Kite entered into a renewable five-year term "lease and contract for space in a retail store." Kite contracted to operate a fine jewelry department in GKI's department store, with a monthly rental price of fourteen percent of the department's gross sales. GKI drafted the contract on its computer, using the standard form that it modified for each leased department.
The contract identified the leased "space" only "as illustrated" on an attached floor plan. That plan, which designated a prominent central portion of the store that was completely covered by one showcase complex and directly faced the *506 main entrance, was annotated "jewelry department * 400 sq.ft."
The showcase complex had been designed, built and used by D.H. Holmes as its jewelry department, and had such special amenities as high-intensity lighting; locking jewelry showcases with burglary-resistant, non-removable, shatterproof glass tops; many small locking drawers; gates controlling access for salespersons; and a motion detector in the ceiling (in addition to the store's basic alarm system) to further protect against burglary. A photograph of one side of one of the two aisles for salespersons down the length of the complex (separated by an interior island work-station, itself split by a passageway) shows thirty-six separately lockable drawers below its display compartments and ten separately lockable access doors to those compartments. Other pictures show that the shallow glass display compartments, with felt display mats and pads that Kite had custom-made, occupied only the top one-third of the showcase furniture, with the other two-thirds having a solid outside facing for their full length, behind which were the tiers of locking drawers accessible only from the salesperson areas. Lighted clear-plastic frames, holding poster-size photographic transparencies of jewelry (provided by Kite), advertised the nature of the department.
The lease declared as its purpose the lessee's "conducting a retail sales department of jewelry," adding that "lessee shall by these presents have the exclusive right and privilege to merchandise and sell all items usually sold by a fine jewelry department."[2] Pertinent to the key issue in this litigation, the contract also contained the following clause regarding change of location:
All of the mentioned store space, and reserve stock space is located in the store of lessor, and may be changed from time to time by lessor at its option and expense.[3]
After the lease was signed, the parties had recurring differences over the direction the jewelry department should take. Kite complained, in his petition and in his reconventional demand to Kaplan's consolidated suit for the balance of the $25,000 loan, that Kaplan:
persistently pressured [him] to stock increasing quantities of cheap, low-end jewelry merchandise (much of which was to be purchased from Sommers & Sommers Jewelry, Inc., the firm of Gustave Kaplan's son-in-law, Walter Sommers), to display such merchandise more prominently, and to participate in store advertisements and promotions featuring such merchandise.
Kite asserted that that kind of jewelry did not belong in, and adversely affected, a fine jewelry department, but he conceded that he did stock the Sommers jewelry from time to time in order to maintain amicable relations with Kaplan.
On the store's opening day, October 29, 1992, Kite placed the Sommers jewelry in one of his twelve display cases, but he returned the balance to Sommers after the holiday season. For the Valentine season in February 1993 and the year-end holiday season in October 1993, Kite again stocked Sommers jewelry, allegedly in deference to Kaplan. Then in January 1994, according to Kite, Kaplan wanted to use Kite's department to conduct a close-out of Sommers' costume jewelry and gift line, and Kite's reluctant agreement brought greater and greater quantities (a thousand pieces as of February 26), leaving less and less room for his fine jewelry (which he *507 removed to his safe until the Sommers promotion would end).
Kaplan, on the other hand, maintained that less expensive jewelry was what should have been promoted and sold by Kite in a department store. He pleaded, in his answer to Kite's reconventional demand in the note suit, that Kite's "initial inventory was much too expensive for the market." But he testified that he never pressured Kite and that it was Kite who asked him to help get Sommers jewelry the later times Kite stocked those items. Kaplan also noted that Kite had felt free to reject other suggestions, including the opening-night recommendation of Kaplan's consultant, a retired department store president, that greater quantities (even tiers) of jewelry should be displayed for sale in a department store.
Kite's department had substantial sales in its early months, but, for whatever cause, that level of sales did not continue. December sales were $77,843 in 1992 (including a $46,000 diamond), but only $28,294 in December 1993. January sales were $11,051 in 1993, but only $529 in 1994 (although they rebounded to $11,317 in February 1994).[4] Kaplan, having seen Kite's sales decline, testified that Kite had less and less better jewelry on display, while Kite testified the better jewelry was crowded out by the Sommers jewelry.[5]
At the beginning of February 1994, Kaplan, who was aware that the January jewelry sales were only $529, approached Kite about moving out of GKI's store into another mall. Kite rejected that suggestion because he did not have the money to open a new store. Twice again in February, Kaplan approached Kite about moving and suggested another location in GKI's store. Kite did not want to move to a location that was less prominent and not equipped for fine jewelry display and sales, but did not discuss these concerns with Kaplan.
On February 24, Kaplan, feeling that Kite was avoiding him, insisted that Kite "think over" moving to another location in the store, talk it over with his wife, and bring his answer back to Kaplan the next morning. Upset by this development, Kite did not approach Kaplan the next morning. Kaplan telephoned Kite at midday and declared that GKI had the right under the contract to move the department without Kite's consent. Kaplan did not, however, state a present intention to move the jewelry, nor did he state the view that he could move it without first preparing the new location or without letting Kite himself attend to the move.
On the next morning, February 26, Kite arrived at the store to find his locked display cases and drawers emptied of their stock (including seven to fourteen pieces of Kite's fine jewelry, but otherwise Sommers merchandise which Kaplan testified was consigned to GKI), his illuminated transparencies papered over, and some hand-lettered *508 signs pointing to a new location for the jewelry department.
Kaplan admitted that, on the day before the relocation, he personally ordered the store manager to find a key to Kite's locked cases and drawers, or to have a key made, so that they could remove the locked contents of Kite's jewelry department. According to Kaplan, he was exercising GKI's option to change Kite's space to the new location.
The new location was a small complex of clothing-type showcases, formerly used for women's exercise wear and swimsuits. Photographs show that the top two-thirds of the showcases were occupied by deep glass display areas, with one or two interior glass shelves in each, with large non-lockable sliding doors for access, and with only one large non-lockable drawer beneath each display area. This complex clearly did not have the amenities, and was only half the size, of the jewelry department initially designated by the lease.
After Kite discovered the unannounced relocation of the jewelry department, he left the store, but later returned with his wife to remove his jewelry from his safe to his home. He never attempted to use the smaller complex in the new location for a fine jewelry department.
On February 28, Kaplan had GKI's lawyer deliver to Kite a formal notice of default, advising him that his failure to vacate the premises by March 10 would bring eviction proceedings.[6] Other communications among Kite, the lawyer, Kaplan and GKI's operations manager, including representations of Kaplan's intent to properly equip the new location, did not heal the rift.[7]
Kite filed this action for damages, followed by Kaplan's separate suit on the note. The trial judge dismissed Kite's suit,[8] not on the basis that GKI did not do the acts described, but on the basis that GKI's acts were authorized by the contract's relocation clause.[9] The judge stated:
It is unfortunate that this incident occurred, but as [New Orleans Hat Attack, Inc. v. New York Life Insurance Co., 95-0055, 95-0056 (La.App. 4th Cir.11/30/95); 665 So.2d 1186] mentions a lease contract forms the law between the parties defining their respective legal rights and obligations. It is unfortunate *509 for Mr. Kite that the lease contract did not contain further provisions for his protection, but the Court cannot read into the contract words that are not there. (emphasis added).
A five-judge panel of the court of appeal unanimously reversed the dismissal of the suit, reasoning that GKI's ousting of Kite, as directed by Kaplan without notice and without first making the new space comparable to the original for fine jewelry display and sales, breached GKI's obligations under La. Civil Code Article 2692 to maintain the lessee in peaceable possession. 97-57 (La.App. 3d Cir.2/18/98), 708 So.2d 473. The court further held unanimously that GKI's conduct constituted an eviction and that Kite was entitled to recover against GKI's insurer, whose policy provided coverage of liability for damage from eviction. However, the court divided on the awards of damages and on the appropriateness of a remand regarding additional damages.[10]
On application of all defendants, we granted certiorari. 98-0715, 98-0751 (La.5/15/98), 719 So.2d 58.
Liability of GKI
Because the GKI-Kite contract which identified the initially specified store space also provided that the store space "may be changed from time to time by lessor at its option and expense," GKI's basic obligation to provide use of the "jewelry department *400 sq. ft." became an alternative obligation within La. Civ.Code art. 1808.[11] Therefore, GKI's obligation under this contract was either to provide the space as "illustrated," or to provide the space as "changed" at GKI's option and expense.[12]
An obligation to provide changed space, without specifying in what respect(s) the space could be changed, is one indefinite as to its object within the contemplation of La. Civ.Code art.1973, which provides:
The object of a contract must be determined at least as to its kind.
The quantity of a contractual object may be undetermined, provided it is determinable.
The Revision Comment to Article 1973 stated, "This Article reproduces the substance of C.C. Art. 1886 (1870). It does not change the law." Article 1886 was identical to Code Napoleon art. 1886, which was discussed in 2 Marcel Planiol, Treatise on the Civil Law § 1001 (La. State Law Inst. trans., 11th ed.1959), as follows:
The obligatory relationship is not formed when the object of the obligation is not determined.
If the indefiniteness bears on the nature of the object, one does not know what thing or what fact can be demanded of the debtor. He who promised "an animal" in reality has not promised at all, since he can free himself by furnishing to his creditor an insignificant insect. If the indefiniteness relates to the quantity, the thing being specified in its kind, the debtor again can liberate himself by *510 offering a derisive performance: if he has promised grain or wine, without further precision, his obligation can reduce itself to a sip of wine or a grain of wheat, and the credit would be a sham.
In the present case, if GKI could by a derisive performance (in Planiol's words) "change" Kite's leased space from the "jewelry department * 400 sq.ft.", designated in the contract, into a small closet with a cigar box stand to display jewelry, then GKI's alternative obligation would truly be a sham. It is not a sham, however, because rules for interpretation of contracts do not permit a court's construing this obligation to be discharged by so trifling a performance. Those rules include:
Art. 2045. Determination of the intent of the parties
Interpretation of a contract is the determination of the common intent of the parties.
Art. 2046. No further interpretation when intent is clear
When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.
Art. 2048. Words susceptible of different meanings
Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract.
Art. 2049. Provision susceptible of different meanings
A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective.
Art. 2056. Standard-form contracts
In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text.
A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party.
The words "space ... may be changed" in the contract here at issue may be clear and explicit, within Article 2046, in respect to the lessor's right to make some kind of change in the space of the jewelry department. However, those words are not clear and explicit as to the nature and extent of the change that may be imposed. Those words are, moreover, not clear and explicit as to whether the lessor may itself physically remove the lessee, and may do so without prior notice.
The trial judge based his decision in favor of the lessor on the fact that the contract, which was the law between the parties, was silent as to any provisions for the lessee's protection. However, the lessor provided this standard-form contract, and silence in the contract should not be interpreted in favor of the lessor, rather than against the lessor, to mean unlimited right in the lessor and no right at all in the lessee. Such an interpretation would violate Article 2056's contrary direction to construe the doubt against the party who furnished the text, and would also permit the absurd result of a derisive performance, which is unacceptable under Article 2046. The language of the standard-form contract must therefore be interpreted to conform to the object of the contract (the operation of a fine jewelry department), within Article 2048, and to have a meaning that renders the words effective rather than ineffective, within Article 2049.
Additionally, the silence of the contract as to the nature and extent of the permissible change suggests application, by analogy, of the principle that when the contract is not specific, the parties intended reasonable specifications (such as a reasonable term for performance under Article 1778, or a reasonable price under Article 2466).
The contract in the present case does allow some change, but what change is allowable is governed by the cited rules of interpretation and further by the good *511 faith performance command of Articles 1983 and 1759.[13] The contract cannot reasonably be interpreted to require the lessor to provide only some space, somewhere in the store, such as the hypothetical closet with a cigar box, or a stand in the toy department. At the other extreme, it would also be unreasonable to rule that space means only location or site, and that the physical showcase complex itself would have to be moved to any new space that the lessor selected.
The changing of space under this contract might take a variety of forms, within reason, based on factors such as the location within the store, the square footage, the furniture style or shape or orientation of the showcases, and others. But the change may not alter the general qualifications of the facility for the object of the contract, namely, the operation of a fine jewelry department whose size initially was to occupy 400 square feet of floor area. That object dictates that the new facility, like the old, must be of comparable size and have comparable high-intensity lighting, locking drawers and locking theft-proof display cases, and other amenities; in other words, the new facility must be truly comparable, although not necessarily identical in detail.
The court of appeal was correct in concluding that GKI's contractual right to change Kite's area was not unlimited (as the Hat Attack case relied upon by the trial judge also declared), and that the lease contract permitted only a change to a site already made reasonably comparable (at the lessor's expense) to the initial fine jewelry department facility. GKI had no right to displace Kite from the fine jewelry facility he was occupying and to place him instead in a clothing showcase complex, half its size and without fine jewelry department characteristics comparable to those of the original site.
The court of appeal was also correct in deeming applicable La. Civ.Code art. 2692(3), which provides:
The lessor is bound from the very nature of the contract, and without any clause to that effect:
. . .
3. To cause the lessee to be in a peaceable possession of the thing during the continuance of the lease.
We noted above that this lease contract imposed upon the lessor not merely a simple obligation to provide the lessee the original jewelry department, but an alternative obligation to provide either the designated jewelry department or a reasonably comparable facility at the lessor's option and expense. Thus the "thing" leased was either the original or a comparable facility, and the lessor was bound to cause the lessee to continue in peaceable possession, during the entire term of the lease, either of the original fine jewelry department or of a comparable one. On February 26, 1994, the lessor failed to maintain the lessee in peaceable possession either of the original complex or of a comparable facility. The fact that the lessor belatedly indicated a willingness to make the new location comparable to the original may be significant in the determination of damages, but not in the determination of a lease violation.
Moreover, the trial judge's declaration that the new location was "suitable" for use was not really a finding of fact that the new facility presented to Kite on January 26 was reasonably comparable to the old. The judge punctuated his reasons for judgment with qualifications of the "suitable" *512 language. The judge stated repeatedly that the new space could have been made suitable and that there was no evidence that Kaplan would not have remedied the implicit unsuitability.[14]
The court of appeal was therefore correct in reasoning that GKI could not oblige Kite to move until GKI prepared a reasonably comparable space in size and facilities in advance; that GKI, by removing Kite from the original location and offering an incommensurately sized and equipped location without first converting it into a comparable one, failed to maintain him in peaceable possession of a fine jewelry department, either as "illustrated" or as "changed;" and that GKI therefore breached its obligations under Article 2692.

Damages
The court of appeal properly awarded Kite $8,246.22 for loss of the improvements he made. However, the appellate court's remand to the trial court for evaluation of Kite's damages from the liquidation sale of his jewelry and from lost profits over the course of the lease was unwarranted. GKI's evidence, along with Kite's admissions, showed sales that arose in the store on which Kite did not send payments through GKI and did not pay GKI the percentage due on the sales. On the basis of this evidence, GKI was entitled to the judicial cancellation of Kite's lease. Because Kite also breached the lease, he cannot recover on his claim for loss from any liquidation of jewelry that may have been proved necessary, and he has no claim for the profit he could have made during the balance of the lease had he not breached it. Accordingly, that portion of the judgment of the court of appeal ordering a remand to the trial court must be reversed.
The court of appeal also awarded Kite $50,000 in general damages for embarrassment, humiliation, emotional anxiety and loss of credit rating,[15] plus $3,000 for conversion of fourteen items of fine jewelry that were not returned for one week. The damages to Kite caused by GKI's failure to maintain him in peaceable possession and by unlawfully removing items from locked compartments in the jewelry department sounded in both contract and in tort.
Nevertheless, only minimal damages for emotional distress are proper under the circumstances of this case. While Kaplan acted hastily and imprudently to force a relocation without properly preparing the new space and making it reasonably comparable to the original (or at least presenting the relocation plan in detail to Kite), Kite's own conduct was far from exemplary. Kite operated deceitfully under the lease by diverting sales proceeds in order not to pay GKI the percentage due as rent. Since Kaplan (had he known) could have placed Kite in default, Kite could not have suffered substantial embarrassment and humiliation from being wrongfully relocated rather than being placed in default. Moreover, Kaplan quickly repented for his precipitous conduct and offered to immediately make the new location comparable to the original, but Kite rejected this attempt by Kaplan to lessen any damages that he had caused. However, while the potential length of the period of disturbed peaceable *513 possession was brief, Kite suffered some damages from this wrongful conduct, and additional damages from the wrongful invasion of his locked compartments in the leased area.
After considering all of the above, we conclude that the amount awarded for these damages is excessive under the circumstances. We further conclude that an award of $1,500 is as high an award of general damages as the evidence will support.

Insurance Coverage
American Central Insurance Company's commercial general liability policy provided in part as follows:
SECTION 1-COVERAGES
COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY
1. Insuring Agreement.
a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage"....
. . .
b. This insurance applies to "bodily injury" and "property damage" only if:
(1) The "bodily injury" or "property damage" is caused by an "occurrence"....
. . .
COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY
1. Insuring Agreement.
a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury"....
. . .
b. This insurance applies to:
(1) "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;....
SECTION V. DEFINITIONS
. . .
3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.
. . .
9. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
10. "Personal injury" means injury, other than bodily injury, arising out of one or more of the following:
. . .
c. The wrongful eviction from, wrongful entry into, or invasion of the right to private occupancy of a room, dwelling or premise that a person occupies by or on behalf of its owner, landlord or lessor; .... (emphasis added).
The policy thus provided two coverages. Coverage A covered liability for "bodily injury," defined as "bodily injury, sickness or disease," but only if from an "occurrence," defined as an accident. Coverage A therefore has no application in this case because Kite's damages were not the result of an accident.
Coverage B covered liability for "personal injury," defined as "injury other than `bodily injury'" arising out of "wrongful eviction." Because the damages awarded were for mental anguish and other nonphysical injuries, Coverage B appears to apply.
The insurer contends, however, that Kite's mental injuries were "bodily injury" under Coverage A, which contains an exclusion for injury "expected or intended from the standpoint of the insured." For this argument, the insurer relies on language in Ledbetter v. Concord General Corp., 95-0809 (La.1/6/96), 665 So.2d 1166, and in Crabtree v. State Farm Ins. Co., 93-0509 (La.2/28/94), 632 So.2d 736, which purports to declare that mental anguish is covered as bodily injury in the policies *514 there at issue. Those cases construing mental injury as bodily injury exemplify the often stated Louisiana rule, based on La. Civil Code art.2056, of liberal construction in favor of coverage. Capital Bank & Trust Co. v. Equitable Life Assurance Society of U.S., 542 So.2d 494, 496 (La.1989).
Here, Coverage B's definition of "personal injury" itself confirms that personal injury is different from "bodily injury" within the contemplation of this policy. Courts may, by liberal interpretation of insurance policies for coverage purposes, include the full gamut of personal injury damages within "bodily injury" damages, but such judicial interpretations do not render meaningless this policy's "personal injury" definition. At most, American Central showed that its own policy form is ambiguous, which results in coverage under Coverage B for any non-bodily personal injury, such as Kite's, notwithstanding that a liberal interpretation might also find coverage under Coverage A for "bodily injury."
American Central could have defined bodily injury as it pleased. The insurer could have stated that mental, psychic, social, reputational and every other kind of personal injury is included within its term "bodily injury", or could have eliminated the express assertion that Coverage B covered liability for personal injury that is not bodily injury. The insurer did not do so.
In the ordinary sense of the words, bodily injury means injury to the body. That is not what happened to Kite in this eviction. The "bodily injury" exception to personal injury coverage does not deny coverage to GKI and Kaplan in this case.

Decree
The judgment of the court of appeal is amended to reduce the amount of damages to $9,746.22 and is reversed insofar as it ordered a remand to the trial court. In all other respects, the judgment is affirmed.
KNOLL, J., dissents and assigns reasons.
KNOLL, J., dissenting.
The lease in question contained a relocation clause indicating the jewelry department "may be changed from time to time by lessor at its option and expense." Kaplan asked Kite at least three different times to consider the possibility of relocating. Rather than addressing the issue, Kite avoided Kaplan. In response, Kaplan exercised his option in the lease to relocate Kite's jewelry department to a different location. The relocation clause that became a part of the executed lease between the parties did not indicate the lessor was required to give notice to the lessee.
In addition, record evidence indicates Kite was conducting business outside of GKI to avoid paying additional rent. This conduct directly violated the terms of the lease, and Kite concedes that he breached the contract. Although the majority recognizes that Kaplan was entitled to "judicial cancellation of Kite's lease," and that "Kite operated deceitfully under the lease by diverting sales proceeds," it awards Kite $1,500 in general damages for GKI's relocation of the jewelry department. Because Kite was violating the lease, I disagree with the majority's finding that he is entitled to general damages.
Accordingly, I respectfully dissent.
NOTES
[*] Johnson, J., not on panel. Rule IV, Part 2, § 3.
[1] Kaplan similarly helped Kite from time to time thereafter, such as by granting extensions on the repayment of the $25,000 loan and by executing a guarantee to a jewelry supplier.
[2] Kaplan conceded that the parties spoke of, and he wrote letters for Kite referring to, a "fine jewelry department." But, he testified, "I didn't mean a Nieman and Marcus."
[3] The earlier draft presented to Kite and to the SBA added: "provided, however, that said change and relocation is satisfactory and agreeable to Lessee." The trial judge accepted Kaplan's testimony that Kite has agreed to the deletion of that proviso, over Kite's testimony he would not have signed had he known of the deletion.
[4] Kite's monthly gross sales during the sixteen months he was at GKI were: October 1992, $4,382; November, $19,421; December, $77,843; January 1993, $11,051; February, $23,994; March, $16,785; April, $12,003; May, $21,165; June, $5,888; July, $10,638; August, $3,748; September, $3,642; October, $4,912; November, $5,215; December, $28,294; January 1994, $529; and February, $11,317. Kaplan testified that sales in all departments suffered after the move to the new location, and the department store itself closed a week before trial in July 1996.
[5] Kite testified that on February 26 he had 400 to 600 pieces in his store safe, but he and his wife moved them to their home that day. The store operations manager testified that on March 2, at the time of the inventory of the Sommers items, only seven to fifteen pieces of fine jewelry were in Kite's safe, and they were customer repair orders. Kite's view on this point was somewhat corroborated by an Alexandria jeweler who allowed Kite to use his store to sell off some jewelry (Kite said he sold less than $5,000 of jewelry there) and by a Michigan liquidation buyer to whom Kite sold his remaining stock for $29,000 (about ten to twenty cents on the wholesale dollar). Kaplan's view was somewhat corroborated by Kite's having sold $38,000 of diamonds in June 1993 to a New York dealer and having reduced his inventory insurance from $250,000 to $100,000.
[6] The notice also purported to notify Kite that his department had been relocated "with the agreement that [it] will remain fully stocked," and that Sommers had asked Kaplan to return all its jewelry and Kaplan would do so on March 3, before which Kite could inspect it. An unsigned "addendum" sheet stated it "is, and has been, the intention of [GKI] to provide the required security provisions such [as] motion detectors and locking cases at the suggested relocation area ... in accordance with state law [and] any stipulations [of] the insurance provider."
[7] Kaplan testified that he, after emptying Kite's locked department without notice, attempted to get word to Kite that GKI was "very happy" to work with him, but Kite refused to discuss the matter. Additionally, when Kite returned to the store to complete the inventory of the Sommers jewelry, the store operations manager, at Kaplan's instructions, assured Kite that "we would try to do whatever we could to resolve the matter, to get over ill feelings, prepare the area the way it should be." But Kite again refused to discuss the matter, telling the manager that "it had gone too far." According to the store operations manager, "arrangement to move the motion detector, prepare locks, prepare lights, to get Tim ready to go was in the makings." The motion detector was moved a week after the relocation. Kaplan testified that GKI also had specially designed jewelry cases available for Kite's use and that the substituted space was comparable to the jewelry displays at other fine jewelry stores in Alexandria.
[8] The trial court rendered judgment in favor of Kaplan for the $7,328 balance on the note. That judgment is not before this court.
[9] Defendants proved, and Kite conceded, that Kite himself had breached the contract. Defendants introduced into evidence sixteen months of Kite's bank deposit records, which showed deposits of proceeds of three sales to GKI customers totaling about $10,000, on which Kite did not pay the percentage of gross sales due to GKI.
[10] The court of appeal unanimously awarded Kite $8,246.22 against GKI for loss of the improvements to the premises made by him. The court also awarded Kite $50,000 in nonpecuniary damages for embarrassment, humiliation, emotional anxiety and destruction of Kite's credit rating, but nonunanimously held Kaplan alone for the last $5,000 of that $50,000, plus $3,000 damages for "conversion" of fourteen items of Kite's jewelry taken and not returned for a week when all the jewelry was removed from Kite's department. Finally, the court nonunanimously ordered the case remanded to the trial court for additional evidence on Kite's business losses for having to sell off his inventory and for loss of future profits.
[11] La. Civ.Code art. 1808 provides: "An obligation is alternative when an obligor is bound to render only one of two or more items of performance."
[12] For a thorough discussion of the economic necessity and the legal effects and case law of relocation clauses throughout the United States, see 1 Milton R. Friedman, Friedman on Leases § 3.4(4th ed.1997).
[13] Art.1983. Law for the parties; performance in good faith

Contracts have the effect of law for the parties and may be dissolved only through the consent of the parties or on grounds provided by law. Contracts must be performed in good faith.
Art. 1759. Good faith
Good faith shall govern the conduct of the obligor and the obligee in whatever pertains to the obligation.
[14] The judge commented: "Mr. Kaplan testified that he would have maintained the new location as close as possible to the old one. However, Mr. Kite never gave him this opportunity.... There is no evidence that the Court heard that ... Mr. Kaplan would have refused to make changes in the location to satisfy Mr. Kite.... There is no evidence that Mr. Kaplan would have refused to negotiate with Mr. Kite about making improvements on the new location.... In this case there was no demand made on Mr. Kaplan to provide what Mr. Kite considered a suitable space. Mr. Kaplan apparently had no demand made on him to improve or enlarge the new location and this Court cannot presume that Mr. Kaplan would have refused to make these alterations had there been any negotiation between the parties at all. Apparently Mr. Kite [after being evicted] simply walked out."
[15] On our review, we conclude that the loss of credit rating was not proved.