796 So.2d 115 (2001)
Johnny E. LAWRENCE, Plaintiff-Appellant,
v.
TERRAL SEED, INC., Defendant-Appellee.
No. 35,019-CA.
Court of Appeal of Louisiana, Second Circuit.
September 26, 2001.
Rehearing Denied October 25, 2001.
*116 Donald L. Kneipp, Monroe, Counsel for Appellant.
McGlinchey Stafford, By James C. Crigler, Jr., Lake Providence, Counsel for Appellee.
Before STEWART, CARAWAY and PEATROSS, JJ.
CARAWAY, Judge.
This dispute involves the interpretation of the price provisions in an executory agreement for the sale of corporate stock. The seller of the stock appeals the ruling of the trial court which denied his claim for specific performance of the contract. Finding that the trial court's interpretation of the contract was in error, we reverse its ruling and order that the sale of the stock for $128,308 be carried out.

Facts
Johnny E. Lawrence ("Lawrence") managed Wisner Elevator, Inc., ("Wisner") from the time it was incorporated in 1975 until April, 1998, when he agreed to sell his shares of stock to Terral Seed, Inc. ("Terral"). Wisner is a closely-held corporation engaged in the business of storing grain in the delta farming area in Franklin Parish. In addition to managing Wisner and owning some of its stock, Lawrence was a longtime member of the board of directors and a corporate officer.
Prior to the 1998 transaction giving rise to this dispute, the four shareholders of Wisner discussed changes for the business at their annual meeting in May, 1997. The shareholders were not satisfied with Wisner's marginal performance, and they considered the need for substantial improvements *117 to the existing facilities. They also explored whether a third party might buy the company, but no such buyer was found. Eventually, Terral reluctantly agreed to buy out the other shareholders.
On April 29, 1998, Lawrence and Terral executed an Agreement to Buy and Sell Stock (hereinafter the "Sale Agreement"). At that time, Wisner's outstanding shares were owned by Lawrence (32.1%), Terral (25.5%), Micro-Chemical, Inc. (25.5%), and John C. Terral (16.9%). Micro-Chemical, Inc. and John C. Terral also executed agreements with Terral which resulted in the sale of their shares in April, 1998. The terms of their sales were not revealed at trial.
The last audited accounting statements for Wisner preceding the Sale Agreement occurred at the end of 1997. Although those statements were not introduced into evidence, the testimony and other financial documents reflect that the company earned a $51,146 profit in 1997. The information also indicates that at year-end 1997, the total equity in the corporation amounted to $367,553.32, with $64,254.35 representing retained earnings of the business.
When they confected the Sale Agreement, the parties did not rely on any updated financial data for the first four months of 1998 in the form of a balance sheet or an income statement. In fact, the Sale Agreement, as quoted below, called for the preparation of such reports through April 30th prior to the closing. At the time of the execution of the Sale Agreement, Lawrence received a deposit from Terral on the purchase price and relinquished his management duties. On May 28, 1998, Terral became the sole guarantor of Wisner's outstanding loan indebtedness when it executed a new guaranty in favor of the corporation's lender, First Republic Bank. Lawrence in turn was released from his guaranty pursuant to the terms of the Sale Agreement.
The dispute which arose from the parties' Sale Agreement concerns the purchase price. The relevant textual provisions of the contract read as follows:
2. Purchase Price. The base purchase price for all of such shares is $128,308 (which is the agreed value of Seller's share of the Company's fixed assets of $400,000, which the Purchaser shall pay to the Sellers (sic) according to their respective interests, as follows):
(a) $6,415.40, upon execution of this agreement.
(b) The balance of $121,892.60 upon delivery to the Purchasers of all such shares at the closing.
3. Addition to Purchase Price. The Purchaser shall also pay to the Seller at the closing to his order Seller's pro-rata share of the amount of the book value of the Company, plus expenses of operations in excess of revenues from 1/1/98 to 4/30/98, not to include inventory shortages or overages, bad debt expense, depreciation, and any other expense not ordinary or necessary for operations, less fixed assets, as these assets shall appear on the balance sheet of the Company as of April 30, 1998, to be prepared and certified by Little & Company, the Company's accountants. The non-current trade receivable of $49,106.00 (Judgment rendered in favor of the Company against Ronald G. Bixler by the Fourth Judicial District Court, Franklin Parish, Louisiana, Docket No. 28,678) and any other trade receivable that is outstanding over 30 days from date of invoice, shall not be considered an asset for the purpose of such valuation. Purchaser shall pursue with reasonable diligence *118 the collection of the Bixler judgment and in the event of collection shall pay Seller the amount thereof prorata to his present ownership in the Company. Purchaser agrees to revive the judgment before it prescribes in 2002 and, if necessary and prudent to do so, revive it again in 2012. Any expenses involved in the attempted collections of these set aside receivables will be borne prorata by present ownership.
The Sale Agreement provided for a closing date of June 30, 1998. In late June, the parties agreed to extend the closing date to July 30, 1998. The closing never took place. On August 13, 1998, Lawrence filed a suit seeking specific performance of the contract. On August 28, 1998, Terral answered the suit and reconvened, alleging damages from Lawrence's failure to deliver the stock and pay Terral, as buyer, the amount of $43,790.75. This amount represented Lawrence's pro rata share of the estimated negative book value of the company as of April 30, 1998 ($37,375.35), calculated by Wisner's accountant allegedly pursuant to paragraph 3 of the Sale Agreement, and the return of the $6,415.40 deposit required by the Sale Agreement. Additionally, Terral claimed (i) securities fraud under La. R.S. 51:712, et seq. for Lawrence's allegedly misleading Terral as to the financial condition of Wisner, (ii) breach of fiduciary duty, and (iii) negligence claims for Lawrence's mismanagement.
Three certified public accountants were qualified as experts and testified at trial concerning the accounting data for the company. Bert Loe ("Loe"), the CPA for other Terral family-owned agri-businesses, testified that he participated in the drafting of paragraph 3 of the Sale Agreement along with Terral's attorney. Loe further testified as follows:
[W]hen they signed the buy sell agreement basically Terral Seed took over the management of the company. I was hired to go in and pull the books off the computer and also set up the Agri System to work similar to the way the Terral Farm Service Agri System worked from May 1, 1998, forward.
Based upon Loe's accounting work, which was not concluded until August 3, 1998, the total stockholders' equity or "book net worth" was determined as of the April 30th balance sheet to be negative $356,302.51. The balance sheet listed the value of the company's fixed assets after depreciation at $259,431.78. The balance sheet included a liability account, entitled "Contract Liability," in the amount of $393,697.73, which pertained to Wisner's "forward contracts" to purchase 1,783,000 bushels of corn from farmers for delivery after the expected harvest of 1998. Those "forward contracts," executed before April 30th under Lawrence's management, promised farmers prices ranging from $2.73 to $3.05 per bushel, yet on April 30th, the nationwide commodity price for corn had dropped to $2.58 per bushel.
Loe also prepared an income statement for the business based upon the new Agri System accounting method and the April 30th commodity price for corn of $2.58 per bushel. The income statement reflected a sizeable operating loss for the four month period ending April 30, 1998, as follows:

INCOME $1,380,514.10
COST OF SALES
 Cost of Grain 1,460,052.83
 Freight 90,014.74
 Handling Charges 35,816.15
 Losses on Contracts 285,345.13
 _____________
TOTAL COST OF SALES 1,871,228.85
 _____________
GROSS PROFIT (490,714.75)
OPERATING EXPENSES 134,283.49
 _____________
OPERATING INCOME (LOSS) ($624,998.24)
 =============

In addition to this operating loss, the total loss for the four month period was computed at $723,855.83 due to a bad debt expense write-off of approximately $100,000. *119 Though not explained in the testimony, the "Losses on Contracts" entry on the income statement, together with some of the anticipated freight and handling charges, apparently coincide with the "Contract Liability" of $393,697.73 listed on the April 30th balance sheet.
From the April 30th balance sheet, Loe explained the workings of paragraph 3 of the Sale Agreement, as follows:
This was a computation of the selling price per the buy sell agreement for the financial statements dated August 3, 1998. We valued the fixed assets lump sum of $400,000, then we take the addition to the purchase price, which wasit started with the book net worth, which was a negative $356,302.51, then we take that operating expenses which were to be added back and excessive revenues which was $134,283.49, less the depreciation which was $5,092.53 less accounting fees for December, 98(sic), which was $10,541.67, less accounting fees for the 4/30/98 statement, which was $9,228.85, which made an addition to equity of $109,422.64, which gave usthen left the fixed assets per balance sheet no depreciation which is $259,431.78 which gave us a total negative value of $506,311.65. And then we had a computation of accounts receivable not collected and over 30 days old, which was $10,206.23 which gave us a total negative number of $516,517.88, when you add that back to the fixed asset lump sum price of $400,000, you get a total selling price of negative $116,517.88.
On cross-examination, Loe characterized the April 30th balance sheet as a "compilation," to be distinguished from an "audited financial statement." While Loe agreed that practitioners preparing interim financial statements need not recognize temporary declines in market value below cost when valuing inventory (including forward purchase contracts), he maintained that including the negative value for the "forward contracts" in the April 30th compilation was appropriate.
At another point in Loe's testimony, he explained that the contract losses reported on the April 30th financial statements had not been actually incurred, or "locked in," in the following exchange with Terral's counsel:
Q. All right, sir. Now, you obviously reported significant losses, were were those losses in effect locked in as of the date of the 4/30/98 statement?
A. Most of them weren't.
Q. How so?
A. What happened was Mr. Lawrence made contracts with farmers to purchase, let's use ajust a hypothetical figure of three dollars ($3) a bushel, the market dropped down to two dollars ($2) a bushel and he hedged them in a commodity hedging account, at that point the loss is locked in at a dollar ($1) a bushel, whether the market goes up or down the loss is still there. And so whether you wait until July oror you value it as ofas of April it doesn't matter, the loss is going to stay the same as far as the market value is concerned.
Additionally, Loe summarized Wisner's April 30th losses as follows:
The primary cause of losses were contracts to farmers to purchase grain were entered into and not hedged at the time the contracts were made, and once the hedges were placed on the contracts basically the cornthe market value of the corn had dropped and so therefore we had ... book losses on these contracts when we hedged them at a later date.
(Emphasis supplied). The actual losses which Wisner incurred at "a later date" on *120 the forward contracts was not revealed by Terral at trial.
Terral's second expert, Charles Redditt, testified concerning his review of Loe's interim financial statement. He explained that under his interpretation of the contract, the "addition to the purchase price" computation had produced a large negative number which, after being added to a smaller positive number (Lawrence's pro rata share of the fixed assets value) had resulted in the purchase price being a negative number.
Lawrence's expert accountant, Tom Oswalt ("Oswalt") testified that the sizeable contract loss recognized in the company's interim financial statement presented basically an inventory issue upon which accountants' views may differ. He testified that dealing with inventory items which addressed operations during only part of a year, and not the complete year, was problematic and could easily produce illogical results in the interim statement.
The record does not clearly establish Wisner's financial performance for 1998. Terral's balance sheet and income statement reporting the month of November, 1998 and year-to-date condition of the business were introduced into evidence by Lawrence with little elaboration. The equity in the company, as reflected on the balance sheet, was still listed as negative $318,901.27. Nevertheless, the monthly net profit reported for November was $63,056.39, and the year-to-date net loss on $6,997,142.61 in gross sales was only $4,103.64. However, casting doubt on the November year-to-date income data, Redditt stated that he believed the report to only reflect information from May 1 through November 30, after Lawrence's management had ended. Redditt reported that Wisner's total loss for the year was $659,500, which represented only slight improvement over the $723,855.83 loss calculated by Loe as of April 30th. Redditt, however, did not introduce audited financial statements for 1998.[1]
Accepting Loe's financial report on the company, the trial court rendered judgment on Terral's reconventional demand against Lawrence, ordering Lawrence to pay $43,790.75 plus legal interest from date of judicial demand and to deliver his 208.5 shares of Wisner to Terral. The trial court explained in its reasons for judgment that Terral was entitled to Lawrence's shares of stock pursuant to the terms of the contract. Because the company had a negative net worth, the trial court considered that Terral was acquiring a liability and was entitled to the return of the $6,415.40 deposit and the additional sum of $37,375.35. The trial court found that in return for the bargain, Lawrence had been relieved of his pro rata guarantee of nearly $100,000. It is from this judgment that Lawrence appeals.

Discussion
The listing of the price for the stock is contained in paragraphs 2 and 3 of the Sale Agreement. Paragraph 2, standing alone, sets a fixed "base" price of $128,308, *121 which was established from the value of the company's fixed assets. It is significant to note that while the value of those fixed assets on the books of the corporation was only $259,431.78, the parties reached a clear agreement that the actual value was more. Moreover, Wisner had indebtedness totaling approximately $300,000, and the parties agreed that Lawrence's guaranty for the indebtedness would become the sole responsibility of Terral as the remaining shareholder.
Paragraph 3 of the Sale Agreement suggests by its language that an additional purchase price would be paid by Terral to Lawrence. In contrast to Paragraph 2, however, the amount of the additional price is not clearly identified. Additionally, because of the multiple accounting items listed in the complicated formula employed in paragraph 3, the aim and measure of the accounting for the remaining portion of the company is not readily discernible. This complicated formula resulted in drastically different views of the price by the parties and the accountants.
A cardinal rule for the interpretation of a contract is determining the common intent of the parties. La. C.C. art. 2045; Amend v. McCabe, 95-0316 (La.12/1/95), 664 So.2d 1183; Barrera v. Ciolino, 92-2844 (La.5/5/94), 636 So.2d 218; Crow v. Monsell, 200 So.2d 700 (La.App. 2d Cir. 1967). To determine the parties' intent, courts must first look to the words and provisions of the contract. When they are clear and explicit, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046; Amend, 664 So.2d at 1187; Barrera, 636 So.2d at 223, 224. Even when the language of the contract is clear and explicit, courts should refrain from construing the contract in such a manner as to lead to absurd consequences. La. C.C. art. 2046; Amend, 664 So.2d at 1187; Lyons v. Coleman, 31,866 (La.App. 2d Cir.5/5/99), 743 So.2d 213; Crow, supra.
The words of a contract must be given their generally prevailing meaning. La. C.C. art. 2047. Amend, 664 So.2d at 1187; Spohrer v. Spohrer, 610 So.2d 849 (La. App. 1st Cir.1992). Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract. La. C.C. art. 2048, Amend, supra; Spohrer, supra. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050; Amend, supra. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. La. C.C. art. 2053; Amend, 664 So.2d at 1188.[2]
In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. La. C.C. art. 2056; Tabor v. Wolinski, 99-1732 (La.App. 1st Cir.9/22/00), 767 So.2d 972; Cooper v. Sealy Realty Co., Inc., 99-1884 (La.App. 3d Cir.6/28/00), 762 So.2d 1290; Kite v. Gus Kaplan, Inc., 98-0715, 98-0751 (La. 11/17/99), 747 So.2d 503; Weeks v. Bossier Parish School Bd., 26,927 (La. *122 App.2d Cir,5/10/95), 655 So.2d 590; Speights Investment Corp. v. Durante, 586 So.2d 677 (La.App. 2d Cir.1991); Allen v. Burnett, 530 So.2d 1294 (La.App. 2d Cir. 1988); Ouachita National Bank in Monroe v. Williamson, 338 So.2d 172 (La.App. 2d Cir.1976). The comments make it clear that Article 2056 is the codification of the long standing jurisprudential rule that any ambiguity or doubt about the meaning of contractual language is resolved by interpreting the contract against the party who prepared it. Allen, 530 So.2d at 1301.
Sale is a contract whereby a person transfers ownership of a thing to another for a price in money. The thing, the price, and the consent of the parties are requirements for the perfection of a sale. La. C.C. art. 2439; Alco Collections, Inc. v. Poirier, 95-2582 (La.App. 1st Cir.9/27/96), 680 So.2d 735. In Benglis Sash & Door Co. v. Leonards, 387 So.2d 1171, 1172 (La. 1980), the Supreme Court explained as follows:
La. Civ.Code art. 2439 defines the contract of sale and states the circumstances which must concur for the perfection of the contract. Thus, the contract of sale is perfected when one party consents to give a certain thing for a price in money and the other consents to give the price in order to have the thing. Although there must be consent to give and to accept a price, it is not essential that the specific sum of the sales price be stated at the time of contracting. The parties can agree that the price may be ascertained by computation or that the price may be fixed by arbitration. Or the parties can consent to buy and to sell a certain thing for a reasonable price, and when they do, the contract of sale has been perfected. The essential thing is that there be a meeting of the minds (as opposed to a disagreement) as to price.
In Directional Wireline Services, Inc. v. Tillett, 552 So.2d 1201 (La.App. 1st Cir. 1989), two related corporations operating a single business sued one of their shareholders to compel specific performance of a sales contract after the shareholder offered all of his shares for sale back to the two corporate entities. The price was listed "at present book value," pursuant to a right of first refusal contained in the articles of incorporation. The corporations were operated under two separate accounting methods, accrual accounting for one and cash accounting for the other. Although both companies' articles of incorporation contained rights of first refusal, the specific provisions thereof differed. The court noted that while one corporation's articles described a method for computing book value, the other corporation's articles did not. The defendant's offer to sell all of his shares in both corporations at "present book value," to be determined in conformity with the articles of incorporation of both corporations, was accepted by letter which stated that "our CPA firm [will] compute the value of [defendant's] stock and will make this available to you in the immediate future." Ultimately, the accountant for the corporations determined that the book value of defendant's stock was a negative number. The corporations then offered $50,000 for all of the seller's stock "in a spirit of compromise," which offer was rejected. Defendant contended that the companies' accountants had arrived at a negative book value based on unaudited financial statements, information furnished by management, and a "Compilation Report," and not in accordance with generally accepted accounting principles. The court held that a valid sale had not been perfected between the parties since there was "no meeting of the minds ... on the essential element of price." Furthermore, although the articles *123 provided a "method" whereby a price could be computed, they had not agreed on how to implement such a method. The contract was therefore void for uncertainty.
Whether a contract is ambiguous or not is a question of law. NAB Natural Resources, L.L.C. v. Willamette Industries, Inc., 28,555 (La.App. 2d Cir.8/21/96), 679 So.2d 477. In the case of ambiguity in a contract, where factual findings are pertinent to the interpretation of a contract, those factual findings are not to be disturbed unless manifest error is shown. However, when appellate review is not premised upon any factual findings made at the trial level, but is, instead based upon an independent review and examination of the contract on its face, the manifest error rule does not apply. In such cases, appellate review of questions of law is simply whether the trial court was legally correct or legally incorrect. Spohrer, 610 So.2d at 853; Alco Collections, Inc., 680 So.2d at 740.
From our view of the Sale Agreement, we initially hold that the interpretation placed upon the Sale Agreement by the trial court presents legal error. The language of the contract as a whole unmistakably establishes that a sale was contemplated by the parties. A sale is a bilateral contract effecting an exchange of values, "a thing" for "a price in money." La. C.C. arts. 2439 and 1908. There is no language in the contract nor evidence in the record indicating that Lawrence did not intend to receive a "price in money" or that Terral expected to receive anything other than the shares of stock. Nevertheless, the trial court used the contract to cause Lawrence's shares of stock to be conveyed without the receipt of any price, which standing alone would be the equivalent of a donation. Additionally, however, the court ordered Lawrence to pay Terral $37,375.35 on the basis of a contract in which Terral was the reciprocal obligee only for the receipt of a "thing," the stock, and nothing more. While contractual interpretation must be applied to resolve, if possible, the conflict between paragraphs 2 and 3, that interpretation may result either in the finding of a price and the enforcement of the sale or the finding of an indeterminate price. Directional Wireline Services, Inc., supra. The finding of an indeterminate price means that there was no meeting of the minds as to an essential element, and the contract fails. In the words of La. C.C. art. 2464, "there is no sale unless the parties intended that a price be paid." If Lawrence did not enter a contact of sale with Terral because the price cannot be determined, he is not obligated to do anything with his shares regardless of the alleged negative value or insolvency of the corporation.
The conflict between paragraphs 2 and 3 concerning the essential element of price is similar to a conflict in the contract addressed by our supreme court in Kite v. Gus Kaplan Inc., 98-0715 (La.11/17/99), 747 So.2d 503. In that case, the court interpreted two provisions in a lease concerning the location of the lease space premises for the lessee's jewelry store which he initially operated in a 400 square foot area within the lessor's large department store. The floor plan of the "jewelry department" was clearly shown on a plat attached to the lease. Nevertheless, a separate clause in the lease provided that "[a]ll of the mentioned store space ... may be changed from time to time by lessor at its option and expense." After tension arose between the lessor, Gus Kaplan, Inc. (GKI), and the lessee (Kite), Kite arrived at the department store one morning to find that GKI had moved his jewelry department from the 400 square foot area of the store to a smaller area of the store *124 with inferior showcases. Addressing Kite's claim for wrongful eviction and breach of lease under the Civil Code articles cited above, the court assessed the two provisions of the contract, as follows:
In the present case, if GKI could by a derisive performance (in Planiol's words) "change" Kite's leased space from the "jewelry department400 sq.ft.", designated in the contract, into a small closet with a cigar box stand to display jewelry, then GKI's alternative obligation would truly be a sham. It is not a sham, however, because rules for interpretation of contracts do not permit a court's construing this obligation to be discharged by so trifling a performance.
* * * * *
The words "space ... may be changed" in the contract here at issue may be clear and explicit, within Article 2046, in respect to the lessor's right to make some kind of change in the space of the jewelry department. However, those words are not clear and explicit as to the nature and extent of the change that may be imposed. Those words are, moreover, not clear and explicit as to whether the lessor may itself physically remove the lessee, and may do so without prior notice.
The trial judge based his decision in favor of the lessor on the fact that the contract, which was the law between the parties, was silent as to any provisions for the lessee's protection. However, the lessor provided this standard-form contract, and silence in the contract should not be interpreted in favor of the lessor, rather than against the lessor, to mean unlimited right in the lessor and no right at all in the lessee. Such an interpretation would violate Article 2056's contrary direction to construe the doubt against the party who furnished the text, and would also permit the absurd result of a derisive performance, which is unacceptable under Article 2046. The language of the standard-form contract must therefore be interpreted to conform to the object of the contract (the operation of a fine jewelry department), within Article 2048, and to have a meaning that renders the words effective rather than ineffective, within Article 2049.
Kite, 747 So.2d at 510.
In the present case, Terral urges an interpretation of paragraph 3 of the Sale Agreement which would reduce the base sale price of $128,308 to zero, despite the express language of the provision indicating that an addition to the base purchase price would result. Even though the complicated accounting formula contained in paragraph 3, as interpreted by Loe, allegedly yielded a negative book value, the paragraph neither suggests the possibility nor expressly explains that the price would be reduced by such a result. Moreover, under Terral's view, a large negative result could reduce the price to zero or a negative sum defeating the clear object of the contract to sell as discussed above. Yet Terral urges that the parties contemplated this eventuality within the scope and purpose of paragraph 3.
Contrary to Terral's view of the operation of paragraph 3, Lawrence relies on the language of the paragraph providing for an "addition" to the base price. While disputing Loe's application of the paragraph's accounting formula, Lawrence insists that any negative book value was not intended to lower the base sales price and that the result of the complicated accounting formula in such instance would simply be discarded as an element affecting the price.
When we look to the extrinsic evidence regarding the parties' intent for *125 paragraph 3, much was left unexplained in the testimony. We do not know which side first proposed the provision. Thomas Terral, who is the president of Terral, did not testify that he expected that Wisner had suffered losses in the first four months of 1998 so that paragraph 3 was intended by him on April 29th to provide a downward adjustment in the base purchase price. He did not testify that he discussed any such concerns with Lawrence or that Lawrence understood that a downward adjustment was a possibility. Instead, he testified that after all of the shareholders tried to sell the corporation to a third party for $400,000 and had found no buyer, the same $400,000 served as the focal point for the prorata price Terral offered to Lawrence. On the other hand, Lawrence, who has an accounting degree and who managed the company through the April 30th evaluation date, did not testify that he had even bothered, prior to signing the contract, to work through the complicated accounting formula of paragraph 3 to estimate what addition to the base purchase price he could expect. This lack of explanation by both sides leaves us with the conclusion that the parties had few negotiations regarding paragraph 3 and did not consider at the time of the execution of the contract that the operation of the provision could defeat the clearly stated purpose of the sale of Lawrence's stock. Most significantly, this doubt regarding the purpose and operation of the provision now disputed between the parties may be resolved against the party who prepared it, which was Terral.
Four actions by the parties contemporaneously with the execution of the Sale Agreement raise strong inferences that a completed sale was intended to be virtually accomplished upon the execution of the agreement. First, Terral paid Lawrence a portion of the purchase price. Second, Lawrence surrendered management of Wisner to Terral. Third, Terral bought the outstanding shares of the remaining shareholders and apparently had no concern in paying those parties some value for their equity in Wisner. Fourth, in May 1998, Terral took action with its bank regarding Wisner's loan indebtedness thus relieving Lawrence from his pro-rata guarantee of the corporate debt. These facts indicate that although executory features of the contract remained to be fulfilled, such as the compiling of the April 30th accounting for the company and the delivery of Lawrence's shares, the additional payment expected to be made on the base price was not in question.
Instead of revealing the parties' negotiations for paragraph 3, the trial centered on the competing testimony of the CPA's. Again, regarding this accounting dispute, the record is severely lacking to inform a layman's understanding of how Wisner's grain elevator activity operated as an ongoing business. Wisner's profit endeavor surrounding the purchase of "forward contracts" with local farmers and the execution of hedge contracts by Wisner in the national market for grain was never detailed.[3] No actual "forward contract" or hedge agreement executed by Wisner in early 1998 was introduced into evidence. No testimony was given explaining the effect of "forward contracts" in the event, for example, that the 1,783,000 bushels of *126 corn at issue in this dispute became undeliverable by local farmers due to a weather disaster. Significantly, no testimony regarding Louisiana's Agricultural Commodity Dealer and Warehouse Law, La. R.S. 3:3401, et seq., was provided, and no claim was presented and explained by Terral which would establish that Lawrence's transacting the "forward contracts" violated the regulatory law.[4]
After a thorough review of the financial records which were introduced with little explanation, and based upon the fleeting insights to the business which we have gleaned from the testimony, we understand the competing accounting views as follows. Terral's accountant, Loe, applied the new Agri System accounting system to the business when Terral took over operations on May 1, 1998. That system, which according to Loe conformed to generally accepted accounting standards, resulted in accounting entries which reflected losses on Wisner's "forward contracts" to purchase 1,783,000 bushels of corn. Those "forward contracts" had not been "locked in" for a profit earlier because Lawrence failed to simultaneously enter a hedge contract. The drop in corn prices to the April 30th price of $2.58/bushel created a $393,967.73 liability for Wisner. On the other hand, Lawrence testified that the execution of those "forward contracts" in early 1998, without immediate hedging, was in conformity with his management practice of prior years, and that no past accounting for the company on an interim basis had ever attempted to value those contracts in the same manner employed by Loe. Oswalt's testimony indicated that the accounting for those "forward contracts" required a decision on the evaluation of inventory which, given fluctuations in the price of corn, could produce a distorted picture of Wisner's financial status.
What is clear in this accounting dispute is that the paper loss of $393,967.73, which Loe determined from the April 30th accounting, would be different on May 1st due to the fluctuation in the price of corn and the fact that the losses on the disputed "forward contracts" were not locked in on April 30th. Loe's testimony was that only later, after April 30th, did Wisner, under Terral's control, hedge the "forward contracts" and lock in losses. However, Terral presented no testimony concerning whether the actual losses were of the same magnitude as the April 30th measure, whether the 1,783,000 bushels were actually delivered, or whether the price of corn fluctuated much higher than $2.58/bushel after April 30th. Redditt's general statement that the $723,855.83 loss of April 30th was only slightly reduced to a $659,500 loss at year end was unsupported by any income and balance sheet reports for year end 1998. The alleged loss was further disputed by the year-to-date and monthly financial statements prepared by Wisner through November and filed by Lawrence to show that the business had in fact broken even through November for the year.
From the above, we find that the two ill-explained views for the proper accounting and the application of paragraph 3 presents further ambiguity regarding the parties' intended meaning for the provision. The only interpretation which completely *127 conforms with the object of the contract is the interpretation urged by Lawrence, who was not the author of the provision. Under Lawrence's view for the exclusion of the paper loss of $393,967.73 as of April 30th, the effect of the provision would be to add no additional amount to the base price. Excluding the $393,967.73 loss, there would still be a negative value under paragraph 3 based upon our estimation of the April financial data. Nevertheless, the negative value, which was never precisely calculated by either party at trial, would not reduce the base purchase price to an inconsequential amount even if paragraph 3 was intended to be applied in the manner urged by Terral. Accordingly, given the ambiguity presented by paragraph 3 and its literal command to provide an addition to the base price, we interpret the provision to have a meaning that renders the sale effective for at least the base price clearly expressed in the contract and intended by the parties.
Underlying our ruling interpreting the contract is our rejection of the April 30th paper loss of $393,967.73 as a proper measure of the financial status of the corporation and the lack of any audited accounting reports for the year 1998 showing that Lawrence's management of the business in the first four months of 1998 and his entry into the disputed forward contracts resulted in damage to the business. This lack of proof of actual damages by Terral means that the other claims presented by its reconventional demand were not established to serve as an offset to Lawrence's entitlement to the price under the Sale Agreement. Terral's reconventional demands are therefore denied.

Conclusion
The ruling of the trial court is reversed and judgment in favor of Lawrence for specific performance of the Sale Agreement is hereby granted. It is hereby ordered, adjudged and decreed that Terral Seed, Inc. pay to Johnny E. Lawrence the remaining portion of the price in the amount of $121,892.60 upon the delivery to Terral by Lawrence of all of his shares in Wisner Elevator, Inc. Legal interest on the award shall run from July 30, 1998 until paid. Costs of this appeal are assessed to appellee.
REVERSED.
APPLICATION FOR REHEARING
Before STEWART, GASKINS, CARAWAY, PEATROSS, and DREW, JJ.
Rehearing denied.
DREW, J., would grant rehearing.
NOTES
[1] The sizeable negative equity position listed in the April 30th and November 30th balance sheets would appear to have placed Wisner in jeopardy of losing its licenses under the Louisiana Agricultural Commodities Dealer and Warehouse Law, La. R.S. 3:3401, et seq. La. R.S. 3:3412 provides that "[t]he commission may refuse to issue a license to any applicant if the commission finds that the warehouse cannot demonstrate a net worth of $100,000." See also, La. Admin. Code Title 7, Ch. 27, § 109(A)(3). In view of the statute, Terral's failure to have introduced year-end audited financial statements for 1998 and the financial statements submitted to the commission for license renewal following April 30, 1998 casts serious doubt over its claim that significant losses occurred as the result of Lawrence's management of the company in early 1998.
[2] La. C.C. art. 2055 provides in pertinent part as follows:

(1) Equity is based on the principles that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another.
(2) Usage is a practice regularly observed in affairs of a nature identical or similar to the object of a contract subject to interpretation.
[3] For example, as Terral's brief to this court states: "At the end of a calendar year of a grain trading company, virtually all of the current year's grain has been received and paid for and has been sold. Forward contracts have been fulfilled and hedges on the Chicago Board of Trade lifted." This condensed view of the business is put forth in brief unsupported by any discussion in the testimony of the Chicago Board of Trade contracts or the concept and consequence of lifting a hedge contract.
[4] While Terral's brief makes passing reference to the Agricultural and Commodity Dealer and Warehouse Law and cites in a footnote one regulation under La. Admin. Code Title 7, Ch. 27, § 107(B)(5)(A), Terral makes no claim that Lawrence violated the law in a manner which would clearly present such issue for review. U.R.C.A. 2-12:4. Moreover, the trial testimony never broached the subject of a violation of this Louisiana regulatory law, and the act did not serve as a basis for any claim presented in Terral's reconventional demand.